Evelyn DOUGLAS, Appellant,

v.

KRIEGSFELD CORPORATION, Appellee.

No. 02–CV–711.

District of Columbia Court of Appeals.

Argued En Banc Nov. 1, 2004.

Decided Oct. 13, 2005.

---

Barbara McDowell, with whom Julie H. Becker and Tamara Jezic, The Legal Aid Society of the District of Columbia, and Patricia Millerioux, Neighborhood Legal Services Program, were on the brief, for appellant.

Timothy P. Cole for appellee.

Michael L. Murphy and David T. Beddow filed a brief for Amicus Curiae Law Students in Court.

Susan Ann Silverstein, Rochester, NY, Rhonda Dahlman, and Michael Schuster, Washington, filed a brief for Amicus Curiae American Association of Retired Persons.

Michael Allen, Washington, and Amber W. Harding filed a brief for Amicus Curiae Bazelon Center for Mental Health Law, Washington Legal Clinic for the Homeless, National Fair Housing Alliance, and National Alliance for the Mentally Ill.

Richard W. Luchs and Roger D. Luchs, Washington, filed a brief for Amicus Curiae Apartment and Office Building Association of Metropolitan Washington.

Susan Ann Silverstein and Michael Schuster, Amicus Curiae AARP Foundation Litigation, and Rhonda Dahlman, Amicus Curiae for Legal Counsel for the Elderly, filed a brief.

Before WASHINGTON, Chief Judge,* TERRY, SCHWELB, FARRELL, WAGNER,** RUIZ, REID, and GLICKMAN, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

This case presents the question under the federal Fair Housing Act whether the trial court erred in denying a tenant the opportunity to defend her landlord's action for possession by claiming discrimination—namely, the landlord's failure to provide a "reasonable accommodation"— based on her alleged "handicap" (mental impairment). We disagree with several of the trial court's rulings and thus reverse and remand the case to the trial court for further consideration of the tenant's request for accommodation.

---

* Chief Judge Washington was an Associate Judge of the court at the time of en banc argument. His official term as Chief Judge began on August 6, 2005.

** Judge Wagner was Chief Judge of the court at the time of an banc argument. Her status changed to Associate Judge on August 6, 2005.

It is important to note, before proceeding, that although four colleagues have either written or joined in dissenting opinions, all of them except for Judge Schwelb subscribe fundamentally to virtually all the legal principles elaborated in this opinion for the court. The difference between the majority and three of our colleagues, as expressed in Judge Glickman's dissenting opinion, lies in applying those principles to the facts.

## I.

Evelyn Douglas (tenant) receives federal Supplemental Security Income (SSI) benefits and is eligible for federally subsidized "Section 8" housing. On August 23, 2001, Kriegsfeld Corporation (landlord) served her with a thirty-day notice to "cure or quit" for violation of her lease covenant to "maintain the apartment in clean and sanitary condition." Later, at trial, the landlord presented evidence that the apartment had a foul odor emanating into the rest of the building; that the toilet was frequently filled with feces and urine; and that garbage, rotting food, and dirty laundry were strewn about. An exhibit to the tenant's earlier, unsuccessful motion for summary judgment confirmed that as a

result of this situation the landlord's representative, Ms. Deborah Reid, had referred the tenant to St. Elizabeths Hospital for a psychiatric evaluation.

The tenant neither cleaned up nor vacated the premises, and the landlord accordingly filed an action for possession on November 30, 2001. Through counsel, the tenant filed a timely answer and asked for a jury trial. Her answer included a general denial, a challenge to the validity of the notice to cure or quit, a defense of discrimination under "the federal Fair Housing Act and local fair housing laws," and a counterclaim of discrimination under "the Fair Housing Act and D.C. Human Rights Act."[1]

Soon thereafter, on February 5, 2002, counsel for the tenant sent a letter to the Director of the Department of Consumer and Regulatory Affairs (DCRA) "requesting a reasonable accommodation under the Federal Fair Housing Act" for a "disability (mental)," namely a "mood disorder," that affected the tenant's ability to keep the apartment "safe and sanitary." Counsel added: The "District of Columbia Government is prepared to assist her with cleaning the apartment." DCRA never took action.[2]

---

1. The District of Columbia Human Rights Act employs virtually the same language as that found in the federal Fair Housing Act, substituting the word "disability" for "handicap" while incorporating verbatim the federal wording for discrimination based on "a refusal to make reasonable accommodations" for the disabled. D.C.Code §§ 2–1402.21(a), –1402.21(d)(3)(B) (2001). The tenant, however, has proceeded in this court exclusively on a discrimination defense under the federal statute.

2. A procedure for filing a discrimination complaint under the federal Fair Housing Act is found in regulations adopted pursuant to a Stipulated Agreement of September 30, 1997 between the District of Columbia and the United States Department of Justice and ad-

ministered by the District's Department of Consumer and Regulatory Affairs (DCRA). 45 D.C.Reg. 8057 (1998); 14 DCMR § 14–111 (1998). Under these regulations, when a tenant requests a "reasonable accommodation," DCRA may grant, grant with "specified conditions," or deny the request. The DCRA Director is given forty-five days (subject to exceptions) in which to make a "final decision" in writing, failing which "the request shall be deemed granted" as a "final decision of the District of Columbia government." 14 DCMR §§ 111.3, –111.4, –111.6, –111.9, –111.11 to 13 (1998).

Because DCRA did not respond within the required forty-five days, the tenant argues that the D.C. government should be held to have granted her request for accommodation. The landlord replies that these regulations

On February 20, 2002, two weeks after his letter to DCRA, counsel for the tenant wrote counsel for the landlord "requesting a reasonable accommodation in complying with provisions of [the tenant's] lease." In this letter—filed with the trial court as Exhibit 2 to the tenant's motion for summary judgment and discussed in counsel's supporting memorandum—counsel explained the basis for an accommodation as follows:

> Ms. Douglas suffers from a mood disorder (mental illness). She is on SSI disability. She has been assigned a case worker with the District of Columbia government and she is an outpatient at a city operated mental health/substance abuse clinic.
>
> ... The District of Columbia government has advised me that they are prepared to assist her with her problems because it is their opinion as well that Ms. Douglas would benefit from intervention and a reasonable accommodation.

Counsel, however, did not describe the type of accommodation sought or the assistance that the District of Columbia government would offer. According to counsel for the tenant's uncontradicted assertion in the trial court, landlord's counsel—who has acknowledged receipt—never responded to this letter.

Later, at a pretrial conference, the court asked for briefs on the question whether the tenant should be permitted to present her discrimination defense based on the landlord's failure to make a "reasonable accommodation" of her alleged mental disability.[3] Thereafter, the trial court denied the tenant's motion for summary judgment, and on the day set for trial, June 17, 2002, the court heard testimony and argument on the reasonable accommodation issue prior to selection of the jury. The trial court conducted this hearing primarily to find out whether the tenant's proffered "mental health experts"—D.C. government employees James Sutton of the Department of Mental Health and Damon Byrd of Adult Protective Services—were qualified to testify, and whether their testimony would support a finding that the tenant's mental illness caused her to leave the apartment in an unclean, unsanitary condition, a finding the court believed was required to support a "reasonable accommodation" defense.

After the tenant's proffered experts had testified, but before the trial court ruled, the landlord's counsel acknowledged to the

---

pertain only to "D.C. government" housing, not to "private landlords." The issue thus raised is a difficult one. Some of the language of the regulations arguably applies only to public housing, and indeed the federal government, by insisting that the District adopt suitable regulations, would seem to have primary interest in accommodations in federally-subsidized housing. On the other hand, the federal Fair Housing Act's "reasonable accommodation" requirement applies to private as well as public housing, see 42 U.S.C. § 3603(a) (2000), and DCRA could well serve as a facilitator of reasonable accommodations by brokering a dialogue between tenant and landlord to that end. Assuming, solely for the sake of argument, that these D.C. regulations apply here, and that the tenant's request was sufficient to trigger DCRA's obligation to re-

spond, we need not consider the implications of DCRA's failure to do·so, for the tenant has not pursued this issue before the en banc court and, in any event, no one questions the propriety of resolving the matter in Superior Court without consideration of a remedy or other participation by DCRA.

3. The tenant, who had been missing for several weeks before the pretrial conference, did not appear for that conference, even though counsel had tried many times to find her. Later, the tenant also failed to appear for trial, but the court permitted counsel to proceed on her behalf after he had represented to the court that her absence was due to mental illness.

court that counsel for the tenant (presumably sometime after his letter of February 20) had requested, as an accommodation, a stay of the eviction proceeding—*i.e.*, a stay of the action for possession—that would permit an agency of the D.C. government to "clean up" the apartment, which the "government had promised" to do. The landlord's counsel further acknowledged: "I did not specifically talk to [tenant's counsel] about that until a couple of weeks ago," around the first of June 2002, "when I told him that his proposal simply lacked any specifics for us to really make an evaluation on." Landlord's counsel added his opinion that tenant's counsel "had no authority to speak for the D.C. government," and thus could not assure that the apartment would be cleaned or, if so, how long it would stay that way. Landlord's counsel eventually communicated his position to tenant's counsel on June 14, three days before trial: "We are willing to allow Ms. Douglas to stay in the unit through the end of August, the beginning of September, but the landlord would definitely request possession of the unit after a period of time"—whether the apartment was clean or not. Counsel then stressed: "They [*i.e.*, the landlord] don't see there's any way to get around or to accommodate Ms. Douglas in this matter to allow her to stay." [4]

The court was troubled that no one at the hearing had asked the tenant's experts, who were in a position to know, exactly "what the possibilities [were] for Adult Protective Services to do cleaning of this apartment." Whereupon counsel for the tenant represented to the court that the D.C. government had a fund for paying contractors to clean apartments of needy persons (most typically the elderly, including those suffering from Alzheimer's disease) on an "ongoing" basis; that his witnesses, Sutton and Byrd, could "satisfy" the landlord that the D.C. government would "get the place cleaned up" in this case; and that if, because of the tenant's mental condition, communication with her became too difficult, he was in a position, with the help of Sutton and Byrd, to pursue a conservatorship that would be able to "take action" on her behalf with respect to the apartment. Counsel stressed, however, that the District government would not incur the cleaning expense without assurance that the tenant could remain in her apartment; the District would not restore the apartment merely for the landlord's benefit.

Accordingly, it was clear to everyone that the tenant was seeking, as a "reasonable accommodation," a stay of the eviction proceeding for a period long enough for the District government to clean the premises and thus cure the tenant's breach of the lease. Counsel also proffered both the resources and the willingness of a D.C. government agency, Adult Protective Services, to keep the premises clean. Signifi-

---

4. After counsel for the landlord had announced this position, the trial court asked counsel for the tenant whether, at that point, he "had any ability to talk with her about settling the case," to which counsel replied:

I stated that I was perfectly willing to entertain any settlement offer, but I would need to speak with her. I tried to, when I went there to deliver the letter to tell her to be here today, but I had no contact with her so it's difficult for me to agree to a move-out if she has no input.

The tenant's unavailability for settlement discussions immediately before trial is not legally determinative of anything, however. In any event, on this record a jury reasonably could find that the landlord's counsel had declined to discuss the matter with counsel for the tenant for a period of many weeks after a "reasonable accommodation" had been requested, and that during the period immediately before trial, landlord's counsel had been insistent on a "move-out," not open to any accommodation even if reasonable.

cantly, moreover, counsel for the tenant was unequivocal in conceding that if the requested delay, coupled with government intervention, "didn't work out"—meaning that if the apartment became filthy again (presumably because the government failed to continue its cleaning services on the tenant's behalf), the landlord would have an acknowledged remedy, eviction. According to counsel, a reasonable accommodation, once given, need not be repeated if the tenant or her government protector failed to comply with its terms.

In sum, the tenant was asking initially for a brief stay of the eviction proceeding based on (1) a proffered mental illness that allegedly had caused her to foul the premises unremittingly, (2) a proffer that the D.C. government would clean the premises and keep it clean, and (3) a concession that eviction would be warranted if the premises did not remain clean. Inherent in this request was the idea that counsel would move for an extension of the stay, and eventual dismissal of the eviction proceeding, if the apartment continued to be maintained in "clean and sanitary condition," as the lease required.

The trial court, after hearing evidence and argument, understood the tenant's request clearly, accepted that the D.C. government would not want to clean the apartment without assurance that the tenant could stay there after the cleaning, and appeared to agree that if the apartment were to remain clean, the landlord's concern about the health and safety of the other tenants would be resolved—*i.e.*, the lease violation would be cured:

> [T]his case almost sounds to me like it's resolvable if the government could make assurances that would satisfy the plaintiff. I mean, I don't want to put the plaintiffs in an awkward position.... [T]hey have their right to a trial and they have waited now for several months

until today's trial date as well. And I don't want to speak for them; but it sounds like they feel sorry for the defendant, too, and if they could just—*if they could be assured that this place was going to be clean and not posing a danger to other tenants* that they might be willing to let this go, or at least to see what happens.... (Emphasis added.)

[*I ]f the place really got cleaned up, and there was some assurance—some reasonable assurance that it was going to be maintained*—these people [*i.e.*, the landlord's representatives] don't have any—they're not out for blood. I mean, I don't think—I don't know, the client [representative of the landlord] is nodding with me as if she agrees. (Emphasis added.)

I don't have the sense that [the representative of the landlord is] anxious to see this poor woman out on the street homeless. Everybody knows that if she gets evicted in this case, it's not going to be very easy for her to get another apartment through the Section 8 Program or otherwise.

... I'm just trying to figure out whether there is a way to resolve this case without the need to—without the need to move someone who might not have to be moved in order to satisfy both parties. And there have been these statements made that the Adult Protective Services can provide the services that the landlord presumably would think were necessary, but won't, because the case is pending. *But I mean, if that's the only impediment to Adult Protective Services going in there and doing the cleaning, both initially and on an ongoing basis,* presumably [Adult Protective Services] could [be] disabused of the erroneous view that they shouldn't act while the case is pending. I mean, why not? (Emphasis added.)

*[I ]f counsel for the landlord said, look, yes, the case would still be pending, we would agree to such stay for some period of time just to see how things go, but I want to tell you if the place is brought up to an acceptable condition and if you keep it there, you know, we're okay with that, why would [the District government] have a problem with that?* (Emphasis added.)

... I can understand why, hypothetically, [District government representatives] don't want to send three people in there for two days and clean it up and then have the defendant evicted the next week. But if they have every reason to believe that their work would not be for naught, I would hope that they're not so tied up in bureaucratic concerns that would make it impossible.

... I guess in some respects we would have to speculate as to whether [the tenant] would allow these folks in to clean her apartment.

To the court's final observation the tenant's counsel replied: "[I]t might take a little bit of effort, it might not take one day, it might take a whole week or two weeks or something like that."

The trial court adjourned the hearing after announcing that it would rule the next morning on the tenant's proffered defense "if we are going to trial." There was no settlement, however. The following day, the court ruled by oral opinion that the tenant could not present a "reasonable accommodation" defense. The jury then heard an essentially defenseless case and found for the landlord (the tenant subsequently was evicted). The tenant appeals from the trial court's ruling that barred her discrimination defense and from the court's order upon the jury verdict that resulted in her eviction.[5]

## II.

The trial court rejected the tenant's disability discrimination defense "for several reasons," each of which the court found "independently sufficient" for its ruling. First, said the court, the tenant's "request for an accommodation"—which was "extremely vague"—came too late, several months after the landlord had served the thirty-day notice to cure or quit and filed the lawsuit. The court acknowledged that it had "equitable authority" to grant relief to the tenant when a lease violation had not been eliminated during the thirty-day "cure period." But it would not exercise that authority here because of the tenant's "apparent refusal to allow people to come into the apartment to do any cleaning" and her resulting failure to cure the lease violation even before trial.

Second, the court opined, the premises were "a direct threat for the health and safety of others who live in the building." Thus, "almost" as a matter of law under the Fair Housing Act "no accommodation would be reasonable."

Third, for lack of qualified "expert testimony," the court found the tenant's evidence insufficient to demonstrate that she "had a mental disability," and that this disability "caused her not to maintain her apartment in a clean and sanitary condition." The trial court conceded that testimony from "a psychiatrist or a clinical psychologist" was not necessary; a qualified "social worker or mental health specialist" could suffice. But in the court's

---

**5.** Before trial, over the tenant's objection, the court had honored the landlord's request to permit a videotaped deposition of its process server, who was moving to Texas and would be unavailable for trial on the tenant's claim of improper service of the notice to cure or quit. Although the tenant has appealed this ruling, we need not address it in light of our disposition in the tenant's favor on other grounds.

judgment, although each of the tenant's two witnesses was a mental health professional with the D.C. government, neither was qualified by "education or experience" to "render an opinion" on either the disability or the causation issue.

## III.

### A.

Before addressing the trial court's analysis, we believe it will be useful to outline the regulatory scheme that governs this case. First, the Federal Housing Act, as amended in 1988, prohibits a landlord from discriminating (among others) against a tenant in the "rental" or "terms, conditions, or privileges . . . or in the provision of services or facilities" of a dwelling because of the tenant's "handicap."[6] A "handicap" is defined to include a "mental impairment" and even applies to someone who is merely "regarded as having such an impairment," whether impaired or not.[7] "Discrimination" includes not only specified acts by a landlord that overtly deny equal treatment, but also a landlord's "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling."[8] In sum, actions based on a land-lord's perception of mental impairment, not only on the reality of it, can give rise to actionable discrimination; and discrimination can be found even in a landlord's failure to offer a tenant assistance, not merely in affirmative acts of rejection.

The federal Fair Housing Act, however, also contains an important limitation. It does not "require[ ] that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others."[9] The Act's administrators, as well as the courts, have also ruled that an accommodation will not be reasonable, and thus will not be required, if it "would impose an undue financial and administrative burden" on the landlord or "would fundamentally alter the nature" of the landlord's operation.[10] (These administrative limitations are not at issue in this case.)

### B.

We turn, then, to the trial court's first ruling: that the discrimination defense is barred because (a) the tenant's request for a reasonable accommodation was "extremely vague," and (b) it came too late, presented months after the landlord had

---

**6.** 42 U.S.C. §§ 3602(h), –3604(f)(1)-(2) (2000).

**7.** 42 U.S.C. § 3602(h)(1)-(3) (2000). Impairments attributable to "current, illegal use of or addiction to a controlled substance" are excluded from protection. 42 U.S.C. § 3602(h) (2000).

**8.** 42 U.S.C. § 3604(f)(3)(B) (2000).

**9.** 42 U.S.C. § 3604(f)(9) (2000); D.C.Code § 2–1402.21(d)(5) (2001).

**10.** Joint Statement of the Department of Housing and Urban Development and the Department of Justice, *Reasonable Accommodations Under the Fair Housing Act* 7–8 (May 17,

2004) ("Joint Statement"), *available at* www.usdoj.gov/crt/housing/joint statement ra 5–17–04.pdf (last visited Nov. 5, 2004). Although this Joint Statement did not result from a notice-and-comment rulemaking, it is entitled to substantial deference. *See Barnhart v. Walton*, 535 U.S. 212, 221, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). In any event, the undue burden test is well established in case law. *See Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1157 (9th Cir.2003); *Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1044 (6th Cir.2001); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 333 (2d Cir.1995).

served the notice to cure or quit and filed suit. We respectfully disagree.

■ In the first place, the tenant's requested accommodation was a brief stay of the eviction proceeding to permit the District government to clean the apartment, as it had reportedly agreed to do, followed by extension of the stay and eventual dismissal of the action if the apartment remained clean. That request was not "extremely vague." The landlord's representative testified that he understood what was wanted, and the trial court's comments at the end of the hearing before trial revealed that the court was clear about this as well. Therefore, unless there was untoward delay in making clear what accommodation the tenant was seeking, there was no disqualifying vagueness here.

■ We turn, then, to timing. Under the Fair Housing Act, unlawful discrimination occurs whenever "a dwelling is 'denied' to a renter because of that renter's handicap."[11] Under federal case law interpreting that provision, a discriminatory denial can occur at any time during the entire period before a tenant is "actually evicted";[12] actionable discrimination is not limited to the shorter cure period specified in a notice to cure or quit, or to any other period short of the eviction order itself.[13] As a general rule, therefore, a "reasonable accommodation" defense is available at any time before a judgment of possession has been entered, if the other requirements of the defense are met.[14]

The trial court did not apply this general rule under the Fair Housing Act that a reasonable accommodation defense will be timely until the proverbial last minute. Rather the court faulted the tenant for failure to make clear what accommodation she was seeking until shortly before trial and, further, for her failure to cure her violation by cleaning the apartment during the seven months after the cure period had expired. In this way the trial court merged its vagueness ruling into the timeliness analysis; the tenant's failure to detail the desired accommodation until months had passed after she first asked for "a reasonable accommodation" resulted in default—the loss of a discrimination defense.

■ We recognize that cases involving requests for "reasonable accommodation" are "highly fact-specific, requiring case-by-case determination,"[15] and that circumstances occurring between the request for accommodation and the eventual trial can

---

11. *Radecki v. Joura,* 114 F.3d 115, 116 (8th Cir.1997) (citing 42 U.S.C. § 3604(f)(1)(A) (2000)).

12. *Id.*

13. *See id.; Housing Auth. of Bangor v. Maheux,* 748 A.2d 474, 476 (Me.2000) (until writ is issued, landlord remains under obligation to provide reasonable accommodation); *Schuett Inv. Co. v. Anderson,* 386 N.W.2d 249 (Minn.Ct.App.1986) (ordering landlord not to evict tenant who failed to cure during cure period).

14. *See supra* note 13; *Anast v. Commonwealth Apts.,* 956 F.Supp. 792 (N.D.Ill.1997) (con-

cluding tenant sufficiently pled that landlord should have postponed eviction hearing); *Cobble Hill Apts. Co. v. McLaughlin,* 1999 WL 788517, 1999 Mass.App. Div. 166 (Mass.App. Div.1999) (holding that stay of eviction proceedings can be reasonable accommodation); *City Wide Assocs. v. Penfield,* 409 Mass. 140, 564 N.E.2d 1003 (1991) (ordering landlord to accommodate tenant's handicap by discontinuing eviction action).

15. *Groner,* 250 F.3d at 1044 (citing *United States v. California Mobile Home Park Mgmt. Co.,* 29 F.3d 1413, 1418 (9th Cir.1994), *appeal after remand on other grounds,* 107 F.3d 1374 (9th Cir.1997), and *Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1104 (3d Cir.1996)).

affect the result.[16] Thus, we must examine the facts in some detail. In doing so, we conclude—as elaborated below—that there was evidence sufficient for a jury to find that principal responsibility for any delay in pinning down the details of the tenant's request, and in working out plans for cleaning the apartment, lay with the landlord. We do not agree with the trial court's ruling that as a matter of law the tenant's request for accommodation was vague and untimely.

The tenant was under lease without incident for six months (January–July 2001). Then in July the landlord, upon observing filthy, unsanitary conditions in the tenant's apartment, gave her a notice to cure or quit (August–October 2001). After she defaulted, the landlord filed suit for possession, and the tenant—for the first time represented by counsel—filed her answer and counterclaim requesting a "reasonable accommodation" under the Fair Housing Act (November 2001–January 2002). At this point, all the elapsed time was attributable to the normal requirements of judicial process that landlords risk having to accept from the business they have chosen to pursue. Within a month, in February 2002, tenant's counsel wrote the landlord's counsel that accommodation was required, in particular, for "mental illness"—a condition that the landlord's agent, Ms. Reid, had perceived at least two months earlier in December 2001, when she successfully referred the tenant to St. Elizabeths Hospital.

■ Under the Fair Housing Act, a landlord "is only obligated to provide a reasonable accommodation" to a tenant "if a request for the accommodation has been made." [17] A tenant who requests a "reasonable accommodation," moreover, should "make clear[ ]" to the landlord that "she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability." [18] And "she should explain what type of accommodation she is requesting." [19] On the other hand, the Fair Housing Act "does not require that a request be made in a particular manner." [20] Even more importantly, the tenant's failure to make clear in her initial request "what type of accommodation she is requesting" is not fatal. According to applicable case law, including an administrative adjudication by HUD itself, once the tenant requests a "reasonable accommodation" (or, without using those exact words, requests an accommodation for a disability) the landlord is obliged under the Fair Housing Act to respond promptly.[21] If the request is not sufficiently detailed to reveal the nature of that request, the Act—as properly interpreted—requires the landlord to "open a dialogue" with the tenant, eliciting more information as needed, to determine what specifics the tenant has in mind and whether such accommodation would, in fact, be reasonable under the circumstances.[22] Any delay from the landlord's

---

16. See id. at 1047.

17. Joint Statement 11.

18. Id. 10.

19. Id.

20. Id.

21. Id. 11 (stating that landlord "has an obligation to provide prompt responses to reasonable accommodation requests").

22. Although neither statutory language in the Fair Housing Act nor its implementing regulations expressly require an "interactive process" for resolving requests for reasonable accommodations, several courts have indicated that the Act's statutory scheme inherently imposes such a requirement. Jankowski Lee & Assocs. v. Cisneros, 91 F.3d 891, 895 (7th Cir.1996) (if landlord is "skeptical of" tenant's alleged disability or landlord's ability to provide accommodation, "it is incumbent upon [ ] landlord to request documentation or

failure to respond promptly to the tenant's request may become the landlord's responsibility.[23]

open a dialogue"); *Jacobs v. Concord Vill. Condo. X Ass'n, Inc.*, No. 04–60017–CIV, 2004 WL 741384, at *2, 2004 U.S. Dist. LEXIS 4876, at *5 (D.Fla. Feb. 17, 2004) (same); *Armant v. Chat–Ro Co., L.L.C.*, No. 00–1402, 2000 WL 1092838, at *2, 2000 U.S. Dist. LEXIS 11386, at *6 (E.D.La. Aug. 1, 2000) (quoting *Jankowski Lee & Assocs.* and further holding that once apprised of possible handicap, landlord has duty to inquire or investigate further); *Auburn Woods I Homeowners Ass'n. v. Fair Employment & Hous. Comm'n.*, (2004) 121 Cal.App.4th 1578, 1598 [18 Cal. Rptr.3d 669, 683] (quoting *Jankowski Lee & Assocs.* and further holding that obligation to "open a dialogue" with party requesting reasonable accommodation is part of interactive process in which each party seeks and shares information); *Cornwell & Taylor LLP v. Moore*, 2000 WL 1887528, at *4, 2000 Minn. App. LEXIS 1317, at *11 (Minn.App.Div. Dec. 22, 2000) (quoting *Jankowski Lee & Assocs.*); *Cobble Hill Apts. Co.*, 1999 Mass.App. Div. at 169 (the fact that tenant's reasonable accommodation request is neither specific nor suitable "does not relieve landlord from making one, particularly when tenant is handicapped by mental disability"). *Compare Andover Hous. Auth. v. Shkolnik*, 443 Mass. 300, 820 N.E.2d 815 (2005) (housing authority did not violate "reasonable accommodation" requirement when evicting excessively noisy tenant, because housing authority had "made every effort to engage in an interactive process for ascertaining and accommodating [tenant's] condition" while tenants "impeded the authority's efforts to engage in a full interactive dialogue" by denying "that there was an ongoing and excessive noise problem"). *See generally* Jennifer L. Dolak, *Note: The FHAA's Reasonable Accommodation & Direct Threat Provisions as Applied to Disabled Individuals Who Become Disruptive, Abusive, or Destructive in Their Housing Environment*, 36 IND. L. REV. 759 (2003). The U.S. Department of Housing and Urban Development has also taken this position. *See HUD v. Jankowski Lee & Assocs.*, HUDALJ 05–93–0517–1 (June 30, 1995) (once informed of possibility that tenant may need accommodation, landlord has responsibility to explore that need and suggest accommodations). The HUD–DOJ Joint Statement explicitly calls for an "interactive process" in which the landlord and tenant "discuss the [tenant's] disability-related need for the requested accommodation and possible alternative accommodations," in the hope of negotiating "an effective accommodation for the [tenant] that does not pose an undue financial and administrative burden for the [landlord]." Joint Statement 7; see id. 9. Finally, when courts apply the reasonable accommodation provision of the Fair Housing Act, it is their established practice to rely on the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, 12102, and the Rehabilitation Act (RA), 29 U.S.C. § 794, both of which mandate an interactive process through which employers and employees explore what accommodations are reasonable. *See* 29 C.F.R. § 1630.2(*o*)(3) (1995); 29 C.F.R. pt. 1630 Appendix (1996); 29 U.S.C. § 794(d); *Giebeler*, 343 F.3d at 1156–57 (stating that court ordinarily applies RA case law in applying reasonable accommodation provisions of Fair Housing Act and also generally applies RA and ADA case law "interchangeably"); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir.2003) (holding that Fair Housing Act requirements for showing failure to reasonably accommodate are same as those under ADA); *Shapiro*, 51 F.3d at 335 ("reasonable accommodation" was intended to draw on case law under RA); *Erdman v. City of Fort Atkinson*, 84 F.3d 960, 962 (7th Cir.1996) ("reasonable accommodation" requirement of Fair Housing Act is most often interpreted by analogy to same phrase in RA). The case law that the landlord relies on is factually distinguishable. *See Lapid–Laurel v. Zoning Bd. of Adjustment*, 284 F.3d 442, 455 (3rd Cir.2002) (holding that Fair Housing Act imposes no duty on local land use authorities to engage in informal interactive process with applicants for variance because those authorities "already face detailed state and municipal requirements mandating formal procedures, which, at least in some cases, prohibit them from engaging in informal, off-the-record negotiations"); *Groner*, 250 F.3d at 1047 (holding that landlord violated no duty to engage in dialogue with social worker when landlord had already been in close contact with social worker for months).

23. Joint Statement 11 ("An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation.").

■ The threshold question, then, is whether the letter of February 20, 2002 from tenant's counsel to landlord's counsel was specific enough to be a "request" that imposed a duty on the landlord to respond. We believe it was. In the interest of expediting the matter, counsel for the tenant should have stated the request for accommodation with greater specificity in his letter of February 20, which did not expressly mention a stay of the proceedings or spell out a plan for cleaning the apartment. That letter, however, did not lack detail. The landlord was informed that the tenant suffered from a "mood disorder," was "on SSI disability," had a D.C. government "case worker," and was an "outpatient at a city-operated mental health/substance abuse clinic." Of particular significance, counsel also told the landlord that the D.C. government was "prepared to assist" in achieving a "reasonable accommodation." Counsel's letter did not make clear exactly what kind of accommodation the tenant was seeking or precisely how the D.C. government would help in making the accommodation reasonable. But in the context of this pending action for possession, a jury reasonably could find from the evidence of record that, as early as February 20, 2002, a request for a stay was implicit; and in the circumstances of a filthy apartment, a jury reasonably could find that, as of that same February date, the reference to the D.C. government suggested that the government would help with the cleaning.

Accordingly, we cannot say that the February 20 letter failed as a matter of law to be a "request" for a "reasonable accommodation." It supplied enough indicia of a plan to cure the lease violation, with intervention by the government and accommodation by the landlord, for a rea-sonable jury to find that the landlord had been obliged under the Fair Housing Act to respond promptly by "open[ing] a dialogue" with the tenant to determine whether an accommodation was feasible and would offer a reasonable possibility of curing the lease violation. From the evidence addressed at the pretrial hearing, a jury could also find that counsel for the landlord failed to engage in discussion with the tenant's counsel until approximately two weeks before trial. Such a finding would eliminate any basis for concluding as a matter of law that the tenant's request for a reasonable accommodation had been presented too late. Indeed, a jury could reason that if the landlord had promptly responded in February, as the law required, and asked for more detail, the ensuing negotiations between the parties, including the role of the D.C. government, presumably would have revealed whether accommodation was a realistic possibility, and thus might well have resolved the matter—or at least created a record of the parties' best efforts to do so—before the trial date arrived in June.

To support its ruling that the tenant's request for accommodation was untimely, the trial court relied on our *Grubb* decision[24] for equitable authority to deny the tenant relief. *Grubb*, however, was a local law decision addressing a notice to cure or quit unaffected by a Fair Housing Act defense. It has no application to the timing issue under federal law. Furthermore, *Grubb* itself noted that a "relevant factor in determining whether forfeiture [of a lease] should be ordered is the presence or absence of 'fair dealing' *by the landlord*."[25] (Emphasis added.) It does not appear that the trial court considered this landlord factor when it relied on *Grubb* to deny

---

24. *Grubb v. Wm. Calomiris Inv. Corp.*, 588 A.2d 1144 (D.C.1991).

25. *Id.* at 1146.

the tenant's discrimination defense on grounds of timing. More specifically, it does not appear that the trial court considered the possibility, reasonably inferable from the evidence, that between February 20 and early June 2002—a period longer than three months—the landlord's counsel refused to respond in any way to tenant's counsel's request for a reasonable accommodation. Given the factual record to date and the applicable law, therefore, we cannot say as a matter of law that the tenant's request was untimely.

Absent a vagueness or a timing issue, therefore, the question remains: was there evidence sufficient for a jury to sustain the tenant's defense that the landlord did not respond to the tenant's request for a "reasonable accommodation"?

## C.

■ The court said "no" for a second reason: that this case came within the statutory exception that cancels a landlord's obligation to offer a reasonable accommodation when the tenancy constitutes "a direct threat to the health or safety of other individuals."[26] Contrary to the trial court's understanding, however, federal courts construing the Fair Housing Act have held—and we agree—that this exception does not come into play until after the trial court has evaluated the landlord's response to a requested accommodation and has determined, after a factual inquiry, that no reasonable accommodation could ameliorate the situation sufficiently to protect the health, safety, and property of others.[27] One federal court has succinctly stated the point this way: "accommodation of an individual's handicap must be attempted before denial of the benefits of federal legislation."[28] We do not believe that the court intended to suggest that the landlord must actually "attempt," *i.e.,* carry out, a requested accommodation if patently unreasonable. Rather, as stated earlier, the landlord must attempt accommodation at least by opening a dialogue with the tenant on the requested accommodation and thus explore accommodation in good faith before saying "no." Here, however, a jury reasonably could find that the landlord never made this required effort for accommodation,[29] and yet the trial court held that the requested accommodation, even if explored further, could not save the situation for the tenant and others in the building. There may be situations in which no reasonable fact-finder could find that the accommodation requested was reasonable or, in any event, could protect the health, safety, or property of others.[30] But this is not necessarily such a case. We believe that in denying the very possibility of an effective accommodation on the facts here, the trial court

---

**26.** 42 U.S.C. § 3604(f)(9) (2000); D.C.Code § 2–1402.21(d)(5) (2001).

**27.** *Radecki, supra* note 11, 114 F.2d at 117; *Howard v. City of Beavercreek,* 108 F.Supp.2d 866, 875 (D.Ohio 2000); *Roe v. Housing Auth. of Boulder,* 909 F.Supp. 814, 822–823 (D.Colo.1995); *Roe v. Sugar River Mills Assocs.,* 820 F.Supp. 636, 639 (D.N.H.1993); H.R. REP. No. 100–711, at 29 (1988), reprinted in 1988 U.S.C.C.A.N. 2173; Joint Statement 4.

**28.** *Roe v. Housing Auth. of Boulder, supra* note 27, 909 F.Supp. at 822.

**29.** *Compare Andover Hous. Auth., supra* note 22.

**30.** *See Arnold Murray Constr., L.L.C. v. Hicks,* 621 N.W.2d 171, 176 (S.D.2001) (in absence of evidence proffered by tenant to counteract landlord's testimony that no accommodation would alleviate risk to other tenants from tenant's threatening, emotional outbursts, landlord not obliged to attempt reasonable accommodation).

ruled prematurely that the "health and safety" exception barred the tenant's defense.

We would agree that, unless the requested accommodation gave adequate assurance that the apartment would be cleaned up promptly—and offered a reasonable prospect for its staying clean—the health and safety exception would likely justify the tenant's eviction. In this case, however, the trial court did not give "accommodation" the required consideration. The court's emphasis on the health and safety exception, rather than on the tenant's request for accommodation, was influenced by its perception of the tenant's "apparent" refusal to allow others to help with the cleaning—a perception enhanced, perhaps, by the fact that the tenant had been eluding counsel and had not shown up for trial.[31] As a result of this perception of an uncooperative tenant, the court concluded "almost" as a matter of law that accommodation would not work and thus that the "health and safety" exception precluded a reasonable accommodation defense. This hedging language of the court ("apparent," "almost") was not raised to the level of a concrete finding of fact and thus left room for further inquiry into the potential for accommodation. This is especially true because (as we shall see below) the tenant was a subject of ongoing intervention by the D.C. government's Adult Protective Services (APS), in addition to the services of an attentive lawyer. Furthermore, the court itself acknowledged that "we would have to *speculate* as to whether [the tenant] would allow these folks in to clean her apartment" (emphasis added)—hardly a finding that she would not do so. Finally, at the pretrial hearing, the court did not question counsel's proffer that the District government, through

APS, would be willing to clean the apartment if the landlord agreed to allow the tenant to remain there. And the court heard tenant's counsel acknowledge that eviction would be warranted if the apartment did not remain clean (through continued government intervention). Implicit in this proffer and concession was the idea that as long as the apartment remained "clean and sanitary," the tenant would be entitled to extension of the stay and eventual dismissal of the landlord's action for possession. Nonetheless, in its ruling the court concluded to a virtual certainty that no reasonable accommodation was realistically available. In doing so, the court did not come to grips with how thoroughly a tenant's request for accommodation must be explored—first by the landlord, then by the court—before a forfeiture order is lawful.

■ After failing for more than three months to respond to the tenant's request for a "reasonable accommodation," the landlord learned at least two weeks before the scheduled trial that the tenant was seeking a brief stay of the eviction proceeding to allow an agency of the D.C. government, APS, to clean the premises. And the landlord learned at the pretrial hearing, if not earlier, that the tenant would not contest eviction if the apartment, once clean, became filthy again. A reasonable jury could find that, given this knowledge, the landlord, nonetheless, did not respond. Here, then, is the point: until a landlord makes a good faith, reasonable effort at accommodation, upon request, after learning of a tenant's mental impairment, the landlord's continued pursuit of a pending action for possession is a discriminatory act under the Fair Housing Act.[32] In this case, however, despite the trial court's initial common-sense observa-

---

**31.** *See supra* note 3.

**32.** *See Andover Hous. Auth., supra* note 22.

tion that the landlord would be completely protected if it agreed to a brief stay of the eviction proceeding while the District government cleaned the premises, the court did not connect that observation with its analysis of the "reasonable accommodation" requirement of the Fair Housing Act. More specifically, it did not recognize that before the "health and safety" exception could be invoked, the landlord had a legal duty—upon request—to "open a dialogue" with counsel for a mentally impaired tenant, not merely a practical responsibility to pursue a settlement for the parties' mutual benefit. Accordingly, as a consequence of its belief that the "health and safety" exception could be invoked without concrete findings on the "dialogue" issue, or even on the "tenant cooperation" issue, the court's reliance on that exception to justify the eviction was, in our view, premature and thus an error of law.

■ The landlord argues nonetheless that the "reasonable accommodation" defense, as formulated by the tenant, is unavailable as a matter of law for another reason, unrelated to the facts. The tenant's request, says the landlord, does not fit the traditional, legal understanding of "accommodation." Several federal courts, we are told, have said that "reasonable accommodation" means changing some rule that is generally applicable to everyone so as to make its burden less onerous on the handicapped individual.[33] The Fair Housing Act itself, however, defines discrimination more broadly as "a refusal to make reasonable accommodations" not only in "rules" but also in "policies, practices, or services,"[34] language broad enough to embrace modification of a wide variety of landlord actions that surely would include a brief continuance of the eviction proceeding to solve a concrete problem—as the case law makes clear.[35] Such a continuance after a tenant violates a lease covenant may not be the kind of accommodation requested—and required—for most handicaps. But the Fair Housing Act requires reasonable accommodation of a "mental impairment," which, unlike many handicaps, inherently reflects varied, unusual behaviors that will require unique responses—limited, of course, to reasonable ones—if the statutory purpose of "accommodation" is to be effectuated. Here, in any event, the tenant asks for waiver of a "generally applicable" rule/policy/practice, namely "relaxation or bending" of the rigid eviction timetable in a standard apartment lease, in order to make the cure period less onerous for the person claiming to be handicapped. In our view, the tenant's request for a brief stay of the eviction proceeding with related follow-up meets the statutory test for "reasonable accommodation" because it imposes no "fundamental alteration" in the nature of the landlord's practice or "undue financial or administrative burdens."[36]

It is interesting to note, moreover, that the tenant's requested accommodation would be considerably less burdensome on the landlord and the other tenants than the typical accommodation recognized in the case law—for example, allowance of

---

**33.** *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 462 n. 25 (D.N.J.1992); *accord Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501–02 (10th Cir.1995); *Keys Youth Servs. v. City of Olathe*, 38 F.Supp.2d 914, 924 (D.Kan.1999); *Alliance for the Mentally Ill v. City of Naperville*, 923 F.Supp. 1057, 1078 (N.D.Ill.1996); *North Shore–Chicago Rehab.*, *Inc. v. Village of Skokie*, 827 F.Supp. 497, 499 (N.D.Ill.1993).

**34.** *Supra* note 8; *see Alliance for the Mentally Ill*, 923 F.Supp. at 1078.

**35.** *See supra* note 14.

**36.** *See* text at *supra* note 10.

pets and priority parking, contrary to the landlord's standard lease/rule/policy. Here, the tenant seeks only a carefully monitored stay of the eviction proceeding, not the typically requested "relaxation or bending" of a rule for the entire term of the tenant's lease. The tenant seeks only time to clean the apartment and show that she can keep it clean with government help—and thus to show that she can protect, no longer threaten, the "health" and "safety" of others.

**D.**

We turn, finally to the merits of the tenant's discrimination defense, including the trial court's findings that the tenant had not proffered enough evidence to show that she had a "mental disability" that "caused" her failure to maintain a clean and sanitary apartment. But first some background on the manner of proof.

 Three theories are available to establish discrimination under the Fair Housing Act: "disparate treatment" (when an action is facially discriminatory), "disparate impact" (when an action is neutral on its face but has a discriminatory effect), and failure to make a "reasonable accommodation." [37] Under the first two theories, a tenant must prove that she is disadvantaged in relation to others "because of" her handicap.[38] In disparate treatment cases, the landlord allegedly is motivated by a discriminatory purpose [39] and courts commonly evaluate the parties' respective positions by employing the familiar three-stage burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (interpreting Title VII of the Civil Rights Act of 1964).[40] In disparate impact cases, however, where the landlord is held accountable for the differential effect of its actions on the tenant without regard to motive,[41] the courts resolve the dispute in fewer steps by weighing the tenant's showing of discriminatory impact against the landlord's justification for its conduct.[42]

 Reasonable accommodation cases are different. A tenant who seeks reasonable accommodation of a disability after receiving a notice to cure or quit, for example, is concerned not about adverse

---

**37.** *Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49, 52–53 (2d Cir.2002); *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir.1996); *Bryant Woods Inn v. Howard County*, 911 F.Supp. 918, 928 (D.Md.1996), *aff'd*, 124 F.3d 597 (4th Cir.1997); *Sunderland Family Treatment Servs. v. City of Pasco*, 107 Wash.App. 109, 26 P.3d 955, 960 (2001).

**38.** *United States v. City of Philadelphia*, 838 F.Supp. 223, 229–230 (E.D.Pa.1993), *aff'd without op.*, 30 F.3d 1488 (3d Cir.1994) (quoting 42 U.S.C. § 3604(f)(1)-(2) (2001)).

**39.** *E.g., Smith & Lee Assocs.*, 102 F.3d at 790; *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1502 (10th Cir.1995).

**40.** *E.g., Regional Econ. Cmty. Action Program, Inc.*, 294 F.3d at 48–49; *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir.1997). In this three-stage inquiry, the tenant must

establish a prima facie case by showing that a discriminatory purpose was a factor motivating the eviction. Once a prima facie case is established, the burden of production shifts to the landlord to "articulate a legitimate non-discriminatory reason" for the eviction. If the landlord makes that showing, the burden then shifts back to the tenant to demonstrate that the landlord's reason was a "pretext" for discrimination. At all times the ultimate burden of persuasion remains with the tenant.

**41.** *E.g., Bangerter*, 46 F.3d at 1501; *Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179, 1182 n. 5 (E.D.N.Y.1993).

**42.** *E.g., Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 269–270 (1st Cir. 1993); *Oxford House, Inc.*, 819 F.Supp. at 1182–1183.

treatment in relation to other tenants but about the failure to receive treatment that reasonably recognizes her disability.[43] The causation the tenant must show in this analysis, therefore, is limited to demonstrating that the requested accommodation "may be necessary" to assure "equal opportunity to use and enjoy a dwelling." [44] Or, as the U.S. Courts of Appeals for the Sixth and Ninth Circuits have put it, tenants "must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." [45] As to manner of proof, the tenant initially must produce evidence sufficient for findings that the requested accommodation is reasonable and may be necessary for enjoyment of the premises equal to that experienced by tenants who are not disabled. Once the tenant produces such evidence, the burden of production shifts to the landlord to introduce evidence in rebuttal, leaving the ultimate burden of persuasion, of course, on the tenant who seeks accommodation.[46]

■ We turn, then, to the merits. To establish a reasonable accommodation defense under the Fair Housing Act, the tenant must demonstrate that (1) she suffered from a "handicap" (or "disability"), (2) the landlord knew or should have known of the disability, (3) an accommodation of the disability may be necessary to afford the tenant an equal opportunity to use and enjoy her apartment, (4) the tenant requested a reasonable accommodation, and (5) the landlord refused to grant a reasonable accommodation.[47]

■ As to the first required showing (suffering from disability), the federal government has stressed that persons, such as the tenant here, who receive Supplemental Security Income (SSI) benefits "in most cases meet the definition of disability under the Fair Housing Act." [48] Counsel, however, did not attempt to demonstrate the tenant's disability on that basis, and thus the trial court did not consider it. Rather, the court evaluated the testimony of expert witnesses called by the tenant's counsel and accordingly premised the "disability" issue on the need for proof by experts. After the hearing, the court concluded that the quality of the testimony establishing the tenant's mental impairment and its effect on the maintenance of her apartment was deficient, because the witnesses were not sufficiently expert to opine on the subject. Eschewing the need for a psychiatrist or psychologist, the trial court observed that a "social worker or mental health specialist" could supply the requisite expert testimony. In acknowledging that possibility, moreover, the court was aware that the tenant's witnesses, James Sutton and Damon Byrd, were employed full time as mental health profes-

---

**43.** *See Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 561–562 (7th Cir.2003); *Bultemeyer v. Fort Wayne Cmty. Sch.,* 100 F.3d 1281, 1283–1284 (7th Cir. 1996) (reasonable accommodation under Americans with Disabilities Act).

**44.** 42 U.S.C. § 3604(f)(3) (2001); *see Good Shepherd Manor Found., Inc.,* 323 F.3d at 561–562; *City of Philadelphia,* 838 F.Supp. at 230.

**45.** *Giebeler,* 343 F.3d at 1155 (quoting *Smith & Lee Assocs.,* 102 F.3d at 795).

**46.** *Id.* at 1156.

**47.** *See id.* at 1147; *United States v. California Mobile Home Park Mgmt. Co.,* 107 F.3d 1374, 1380 (9th Cir.1997); *Prindable v. Association of Apt. Owners of 2987 Kalakaua,* 304 F.Supp.2d 1245, 1254 (D.Haw.2003); *Adam v. Linn–Benton Hous. Auth.,* 147 F.Supp.2d 1044, 1047 (D.Or.2001); *Means v. City of Dayton,* 111 F.Supp.2d 969, 977 (S.D.Ohio 2000); *In re Kenna Homes Coop. Corp.,* 210 W.Va. 380, 557 S.E.2d 787, 794 (2001).

**48.** Joint statement 13 n. 10.

sionals by the District of Columbia government. Sutton, who had a masters degree in "mental health," had been a supervisor with the District's Emergency Psychiatric Response Division for sixteen years, with personal experience making psychiatric assessments and ordering involuntary civil commitments. Byrd had been a social worker with the District's Adult Protective Services Unit for three years, with experience investigating abused, neglected, self-neglected, and disabled adults. Both had daily, on-the-job experience with diagnosing persons as mentally ill, and each had multiple encounters with the tenant, whom Byrd had visited sixteen times. In court, Sutton and Byrd each testified that, in his opinion, the tenant was mentally ill, and that this illness, exacerbated by heavy dependence on alcohol, substantially limited her ability to care for her apartment.[49] The trial court, however, declined to grant credence to these appraisals.

It is not entirely clear whether the court was saying that individuals with Sutton's and Byrd's training and experience were not qualified to opine on "mental impairment" under the Fair Housing Act, or was saying merely that the two witnesses, while perhaps generally qualified for this purpose, did not impress the court enough to justify crediting their testimony in this particular case. A careful reading of the trial court opinion, however, conveys the strong impression that the court was saying the former, because it stressed that these witnesses were unqualified to offer opinions as to the tenant's particular "diagnosis," including analysis of specific symptoms of the "mood disorder" ascribed to the tenant in the report of a St. Elizabeth's Hospital psychiatrist who had assessed her.

In particular, the trial court rejected Sutton as an expert witness, despite his training and experience, because of the court's perception that Sutton had relied "heavily" on the psychiatrist's diagnosis of the tenant's "mood disorder, NOS" without an accompanying opinion by that psychiatrist on "any connection" between that particular disorder and "the condition of her apartment." The court was especially influenced by Sutton's inability to explain the "NOS" part of the "mood disorder" diagnosis. As to Byrd, the court observed:

> Mr. Byrd was readily convinced, *"as I suspect all of us would be,* that there was some mental illness that he was dealing with, but he himself testified that he's not able to render a *specific diagnosis,* that he's not qualified to make mental health diagnosis." (Emphasis added.)

In sum, the court disqualified both Sutton and Byrd as experts because, although they could perceive the tenant's mental illness in general—as the court itself apparently could, too, from the testimony presented—they could not "render a specific diagnosis" and as a consequence, in the court's view, could not sufficiently

---

**49.** Alcohol abuse, like mental impairment, is a "handicap" that can serve as the basis for a discrimination claim under the Fair Housing Act, 42 U.S.C. § 3602(h)(1)-(3) (2000); H.R.Rep. No. 100–711, at 22 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2183 (making clear Congress's intent that the Fair Housing Act's definition of "handicap" be interpreted and regulated consistently with the same term in the Rehabilitation Act of 1973); *United States v. Southern Mgmt. Corp.,* 955 F.2d 914 (4th Cir.1992). Accordingly, someone with an alcohol problem, like a mentally impaired individual, must be afforded a reasonable accommodation pursuant to the Fair Housing Act. *Samaritan Inns v. District of Columbia,* 11 Am. Disabilities Dec. 1166 (D.D.C.1995), *aff'd in relevant part,* 325 U.S.App. D.C. 19, 114 F.3d 1227 (1997); *Walker v. Weinberger,* 600 F.Supp. 757 (D.D.C.1985); *Robinson v. Devine,* 37 Fair Empl. Prac. Cas. (BNA) 728 (D.D.C.1985).

show the connection between the tenant's illness and her filthy apartment.[50]

In our opinion, the court's requirement of expert testimony to establish the tenant's "mental impairment" under the Fair Housing Act—and especially the further requirement that experts opine with a "specific diagnosis"—sets the bar too high. "Mental impairment" is a generic term that incorporates multiple diagnoses and, on occasion, is susceptible to identification by lay individuals even less trained and experienced than Sutton and Byrd. Indeed, persuasive case law firmly establishes that lay persons—while not competent to offer specific diagnoses—can render opinions as to a person's mental condition based on their own personal observations.[51] No more than that—no specific diagnosis—is required for a finding of mental impairment under the Fair Housing Act.[52]

Nor, in this particular case, is much if any expertise required to permit a reasonable jury to find that the tenant's mental impairment, combined with alcohol abuse, was a contributing cause of the unsanitary condition of her apartment. We agree with the trial court that, in general, "[t]here are plenty of people who have mental disabilities who can keep their apartments clean," and that "there are plenty of people who don't have mental disabilities who don't keep their apartments clean." But, on this record, it is not readily apparent what explanation there might be—other than mental illness and

**50.** The trial court relied for its expert testimony analysis on our decision in *American Univ. v. Comm'n on Human Rights*, 598 A.2d 416 (D.C.1991), an employment discrimination case. In *American University*, we reversed a decision of the D.C. Commission on Human Rights, applying the Human Rights Act, in which the Commission had found discrimination in firing an employee without making a reasonable accommodation for her manic depression. We saw nothing in the record to show that the employee's job deficiencies were related to her handicap, or that a reasonable accommodation was possible. In the first place, no expert testimony was "offered to prove that complainant's disablement prevented her from performing the job," *id.* at 423, whereas in this case witnesses Sutton and Byrd testified that there was a causal relationship between the tenant's mental illness (exacerbated by alcohol abuse) and the deterioration of her apartment. Furthermore, in American University, the complainant acknowledged that medication "allowed her to behave in a 'normal' way," *id.; cf. Sutton v. United Air Lines*, 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (holding that petitioner was not disabled under Americans with Disabilities Act when corrective measures, eye glasses, had completely corrected physical impairment). That acknowledgment effectively obviated any need for an accommodation by her employer, whereas in this case the tenant's apartment living could not be normal without intervention. Finally, in *American University*, the employee herself denied any relationship between her illness and her job performance, in contrast with the case proffered here on the tenant's behalf (despite her own reported denials). We need not decide whether these distinctions have relevance here, for as elaborated in the text below, *American University* is inapposite for a more fundamental reason: on this record, expert testimony is not essential to findings of the tenant's mental illness and its causal relationship to her filthy apartment.

**51.** *E.g., Connecticut Mut. Life Ins. Co. v. Lathrop*, 111 U.S. 612, 4 S.Ct. 533, 28 L.Ed. 536 (1884); *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir.1993); *deBruin v. deBruin*, 195 F.2d 763, 764 (D.C.Cir.1952).

**52.** 42 U.S.C. § 3602(h) (2000); Joint Statement 13–14; *cf. Advocacy Ctr. for Persons with Disabilities, Inc. v. Woodlands Estates Ass'n Inc.*, 192 F.Supp.2d 1344, 1347 (M.D.Fla.2002) (plaintiffs need not show "exact disabilities" to demonstrate they are "developmentally disabled" and thus entitled to "reasonable accommodation" as handicapped persons under Fair Housing Act).

alcohol abuse—for the tenant's filthy apartment.[53]

■ In order to establish the first, "disability" element of a prima facie case of discrimination, counsel for the tenant proffered expert testimony that his client was mentally ill, rather than rely on the landlord's mere perception of the tenant's illness (*e.g.*, through Ms. Reid's referral of the tenant to St. Elizabeths Hospital),[54] or on the tenant's eligibility for federal SSI disability benefits. We thus turn to the evidence.

The tenant's expert mental health specialist, James Sutton, testified that the Department of Mental Health's Comprehensive Psychiatric Emergency Services (CPES) had wanted to "bring [the tenant] in involuntarily" for civil commitment but did not have sufficient proof "that she was in imminent danger to herself or others." Sutton noted that the tenant "didn't see anything wrong" with her apartment, insisted that "she didn't have a mental health problem," and "was · waiting for money to be coming from the Navy." In Sutton's opinion the tenant "was suffering from some paranoia and some delusions." He added that he had referred her to a CPES psychiatrist, who had reported that she "was alcohol dependen[t] and that she

suffered from mood disorder, NOS." Sutton described his understanding of a mood disorder but could not explain the term "NOS" (not otherwise specified).[55] In light of all the foregoing, Sutton had tried to impress on the tenant the urgency of cleaning her apartment, and had told her that in any event "she would have to appear in court." To which she had replied: "Jesus is going to take care of it." Sutton was convinced, accordingly, that there was "a relationship between" the tenant's "mental illness" and "alcohol" abuse and the "deplorable" state of her apartment.

The tenant's other expert, Damon Byrd, the social worker with Adult Protective Services, described the tenant's appearance on one occasion as "halfnaked" and "completely exposed," with "heavy makeup" that was "caked up and smeared on her face." Byrd added that the tenant "was in delusional or paranoia behavior" while claiming that "she was in the Navy" and "waiting to receive her money." He testified that her "insight and judgment" were "poor," and that "[s]he did not completely understand the hazards of the apartment situation." In answer to a direct question from the court, Byrd replied,

---

**53.** It is interesting to note that under the Fair Housing Act, a tenant suffers a "handicap," for purposes of establishing a prima facie case, if the landlord merely perceives or regards the tenant as having a handicap—whether she has one in fact or not—and then discriminates (including refusal to make a reasonable accommodation) solely on the basis of that unconfirmed perception. *Neithamer*, 81 F.Supp.2d at 4–5 (citing Fair Housing Act, 42 U.S.C. § 3602(h)(3); see *supra* note 6 and accompanying text). Such a provision is common to antidiscrimination statutes. *E.g.*, Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, 12102 (2000); Rehabilitation Act of 1973, 29 U.S.C. §§ 701, 705 (2000); District of Columbia Human Rights Act, D.C.Code § 2–1401 (2001). This emphasis on the landlord's perception of mental illness, for example, rather than on the estab-

lished reality of it, is further (albeit indirect) evidence of a legislative policy that proof of a diagnosed subset of mental illness is not required before a landlord can be found to have discriminated on the basis of such handicap.

**54.** *See supra* notes 6 and 52.

**55.** Mood Disorder Not Otherwise Specified is a category that "includes disorders with mood symptoms that do not meet the criteria for any specific Mood Disorder and in which it is difficult to choose between Depressive Disorder Not otherwise Specified and Bipolar disorder Not Otherwise Specified." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 375 (4th ed.1994).

"Do I think she has a mental illness, yes," adverting to his observations of her "erratic behaviors on numerous occasions" and a diagnosis of her "mood disorder" by Dr. Henerian of the Comprehensive Psychiatric Emergency team. The court then asked Byrd: "Is a failure to maintain an apartment or other living space in a clean and sanitary way ... a typical symptom of mood disorder or is it just an example of a failure or inability to exercise good judgment"? Byrd replied:

> Actually, the connection lies pretty much, in my opinion, with the alcohol. Half the time she's not sober. So if she spends half her time drinking, she's not able to effectively clean her apartment, notwithstanding the fact that the apartment is rodent and rat infested. That doesn't help the situation. So I would say, a combination of—I believe that the alcoholism impacts her diagnosis of mood disorder....

We are satisfied that, consistent with the understanding of "mental impairment" under the Fair Housing Act, Messrs. Sutton's and Byrd's observations were competent evidence sufficient for a jury to consider the tenant's alleged disability and its causal relationship to the unhealthy state of her apartment. Given the trial court's comment that it suspected "all of us" would be "readily convinced" that the tenant had "some mental illness," it appears the trial court itself would find that the evidence of record was sufficient for a jury to consider the "mental impairment" issue under the Fair Housing Act as we have interpreted it.

■ We turn to the second requirement of a prima facie case (landlord's knowledge). The evidence, as we have seen, tended to show that the landlord knew or had reason to know that the tenant suffered from a mental impairment. The letter of February 20, 2002 from ten-ant's counsel informed the landlord's counsel that the tenant "suffer[ed] from a mood disorder (mental illness)," was "on SSI disability," and was "an outpatient at a city operated mental health/substance abuse clinic." Earlier, in fact, the landlord's own agent, Deborah Reid, after inspecting the apartment several times, had urged the tenant to seek help from St. Elizabeths Hospital, whereupon she did so and received the psychiatrist's diagnosis of "mood disorder, NOS" referred to above. The evidence, therefore, is sufficient for a jury to consider this second requirement.

■ Implicit in the third requirement (need for accommodation) is a showing that the disability has caused the need for accommodation and that the accommodation requested would eliminate the problem. Here, the evidence tended to show that the tenant's mental disability was a contributing cause of the filthy apartment, and that some kind of accommodation of that disability would have to be made for her not only to continue her use and enjoyment of the apartment but also to continue her tenancy without threatening the health and safety of others. Counsel for the tenant proffered that if the landlord would stay the eviction proceeding, the D.C. government would clean the apartment, and that unless it remained clean the landlord would be entitled to evict her. As we explain below, this proffered solution would appear to be sufficient to solve the problem, leaving us to inquire whether that solution, as implemented, would be "reasonable."

■ The nub of this case is thus the fourth element of a prima facie defense of reasonable accommodation, namely, the reasonableness of the accommodation the tenant proposed. There was no question in the landlord's—or the court's—mind that the tenant, in requesting a "reason-

able accommodation," meant a stay of the eviction proceeding for the period reasonably required for the D.C. government to clean up the apartment and for the tenant then to demonstrate, through the continuing help of the D.C. government, that she would keep it clean. Furthermore, no one disputes that a clean apartment would erase the legal justification for the notice to cure or quit and thus would cure—albeit belatedly—the tenant's default.[56] The landlord takes the position, however, that the tenant has not carried out her responsibility to make a precise enough request to allow the trial court—and ultimately a jury—to find that the accommodation she sought was "reasonable" under the Fair Housing Act. We cannot agree.

Not long ago, in *Giebeler v. M & B Associates*,[57] the U.S. Court of Appeals for the Ninth Circuit considered both the burden of proof and the merits under "reasonable accommodation" analysis applicable to the Fair Housing Act. The panel noted that courts construing that Act have drawn on case law interpreting the same requirement under the federal Rehabilitation Act (RA) and the Americans with Disabilities Act (ADA).[58] The interpretive formulations under each, while conceivably

**56.** By applying federal fair housing law to require a reasonable accommodation if requested prior to eviction, we in no way modify local law that enables the landlord to sue for possession upon expiration of the notice to cure or quit. The right to sue remains in effect, suspended on this occasion by the preemptive requirements of federal law. That said, it is important not to overlook the fact that the tenant did not request a reasonable accommodation until after the landlord had filed suit, based on the tenant's failure to cure or quit. Absent such a request, the trial court correctly ruled that the landlord had not discriminated against the tenant simply "by serving the notice to quit or by filing the lawsuit." The discrimination occurred, therefore—if at all—only because of the landlord's failure to grant a reasonable accommodation, after one had been requested, during the period after the landlord had filed suit but before the court had issued an order to enforce a forfeiture.

One further clarification is in order. The tenant's answer—alleging the landlord's failure to afford the tenant "a reasonable accommodation in her housing unit before the institution of this lawsuit"—is legally insufficient; as previously noted, the tenant had not requested a reasonable accommodation, and thus had not proffered that basis for discrimination, before the landlord filed suit. On the other hand, the landlord has been aware since at least February 20, 2002 (when counsel for the tenant wrote counsel for the landlord) that the tenant was continuing to seek a reasonable accommodation. Furthermore, the tenant's counterclaim charged discrimination "by seeking possession of the [tenant's] unit through court process and not affording the [tenant] a reasonable accommodation in her housing unit"—a claim in the disjunctive that, unlike the answer, does not limit the counterclaim to discrimination during the period before the landlord filed suit. Finally, the landlord has responded to the tenant's answer and counterclaim on the merits, not on the ground that each failed for lack of a proper pleading; the landlord has not alleged any irregularity here. This court has held that, when a plaintiff has ample opportunity to respond to a defense not specified in the answer, the plaintiff cannot claim to have been prejudiced by the defendant's failure to plead a defense in the answer, and thus the defense is properly before the trial court—it is not waived—despite its omission from the pleadings. *Goldkind v. Snider Bros., Inc.*, 467 A.2d 468, 472 (D.C.1983); *Scoggins v. Jude*, 419 A.2d 999, 1003 (D.C.1980); *Jackson v. District of Columbia*, 412 A.2d 948, 951 (D.C. 1980); *Wright v. McCann*, 122 A.2d 334, 336 (D.C.1956). Accordingly, the tenant's limitation of her reasonable accommodation defense in her answer to the period before institution of this lawsuit is not fatal; that defect has been amply cured by the parties' litigation of that defense extending through the period until the trial court entered judgment of possession.

**57.** *Supra* note 10, 343 F.3d at 1148–1150, 1156–1157; *see supra* note 22.

**58.** *Giebeler, supra* note 10, 343 F.3d at 1148–1150, 1156–1157.

differing in a way that could be outcome-determinative in some instances, are not significantly different from one another.[59] Under RA case law as interpreted by the Ninth Circuit, the party requesting accommodation "bears the initial burden of producing evidence that a reasonable accommodation was possible," whereupon "the burden shifts to the other party to produce rebuttal evidence that the requested accommodation is not reasonable."[60] The U.S. Court of Appeals for the District of Columbia Circuit has expressed the RA test differently, stating that the proponent "need only show he seeks a *'method of accommodation* that is reasonable in the run of cases' (emphasis in original)."[61] Under the ADA, the Supreme Court has adopted a formulation akin to that of the D.C. Circuit in the RA case: the requesting party "need only show that an accommodation 'seems reasonable on its face, *i.e.*, ordinarily or in the run of cases,'"[62] after which the burden shifts to the other party "to demonstrate that the accommodation would cause undue hardship in the particular circumstances."[63] Alternatively, if the requesting party cannot show that the proposed accommodation would be reasonable in the ordinary run of cases, she "nonetheless remains free to show that special circumstances warrant a finding that ... the requested 'accommodation is reasonable' on the particular facts."[64] It is important to note, therefore, that aside from the secondary, alternative formulation focused on "the particular facts" of a requested accommodation, the tenant's initial burden is to proffer a generalized, categorical accommodation (*e.g.*, "method" of accommodation reasonable "on its face"), which the landlord has the burden of rebutting with specifics that reveal an "undue hardship" on the landlord's operation.

In applying "reasonable accommodation" under the Fair Housing Act, the Ninth Circuit concluded in *Giebeler* that the prospective tenant had proffered evidence sufficient to satisfy both the RA and the ADA formulations.[65] Accordingly, in reversing the district judge's finding that the prospective tenant had failed to proffer a reasonable accommodation, the court did not have to choose between the two formulations for Fair Housing Act purposes. In the present case as well, we do not have to select one of these formulations, for we cannot say as a matter of law that the tenant has failed to satisfy any, let alone all, of the tests specified in *Giebeler.* More specifically, we cannot conclude on

59. *See id.* at 1149, 1156–1157

60. *Id.* at 1156 (quoting *Vinson v. Thomas,* 288 F.3d 1145, 1154 (9th Cir.2002)).

61. *Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C.Cir. 1993).

62. *Giebeler, supra* note 10, 343 F.3d at 1156 (quoting *U.S. Airways v. Barnett,* 535 U.S. 391, 401–402, 122 S.Ct. 1516, 152 L.Ed.2d 589(2002)). In *Barnett,* the Supreme Court cites cases from several federal circuit courts of appeals using similar formulations which the Court describes as "functionally similar," namely, to defeat summary judgment the proponent will meet the "burden on reasonableness" by showing that, "at least on the face of things," "the accommodation will be feasible for the employer"; and the "burden of production" is satisfied "by showing 'plausible accommodation' "; and the proponent "need only show he seeks a *'method of accommodation* that is reasonable in the run of cases' (emphasis in original)" (RA case from D.C. Circuit, *supra* note 61). *Barnett,* 535 U.S. at 402, 122 S.Ct. 1516.

63. *Giebeler, supra* note 10, 343 F.3d at 1156 (citing *Barnett,* 535 U.S. at 402, 122 S.Ct. 1516).

64. *Id.* (quoting *Barnett,* 535 U.S. at 405, 122 S.Ct. 1516).

65. *Id.* at 1157.

this record that the tenant's request for a stay, coupled with her proffer that the D.C. government would clean the apartment and keep it clean, was not "possible" or did not state a "method of accommodation that is reasonable in the run of cases" (emphasis omitted). Nor can we conclude that her proffer did not "seem[ ] reasonable on its face, *i.e.,* ordinarily or in the run of cases" (or, even if not facially reasonable, was not "reasonable on the particular facts").[66]

It is not clear from *Giebeler* how much detail a tenant must offer in evidence to meet her initial burden under these respective formulations. The landlord argues that the tenant, while making clear in general what kind of accommodation was requested, never proffered the kinds of details that ordinarily would be required to convince a fact-finder that the tenant's proposal assuredly was reasonable, that is, likely to keep the apartment clean. For example, tenant's counsel did not specify the number of days required for the stay, or the basis for assuring tenant cooperation, or the frequency and duration of cleaning by the District government. Indeed, we must add, counsel for the tenant permitted Mr. Sutton and Mr. Byrd to depart the hearing without addressing the particulars of D.C. government cooperation.

If the landlord had met its own responsibilities under the Fair Housing Act, the landlord's argument might have force, even in light of the generalized initial showing the tenant ordinarily may make under an RA or ADA formulation. But there is evidence from which a reasonable jury could find that the landlord had failed to do so. As we explained earlier, citing an abundance of case law,[67] the February 20, 2002 letter from tenant's counsel requesting a "reasonable accommodation" supplied enough detail to trigger an obligation of the landlord to open a dialogue with the tenant, through counsel, to determine more specifically what was desired. The record also shows that the landlord's counsel conceded before trial that he had learned, in particular, of the tenant's desire for a stay, as well as about her counsel's proffered cleaning of the apartment by the D.C. government and the further proffer that the government would keep the apartment clean—failing which, eviction would be conceded. Finally, there is evidence that would allow a reasonable jury to find that the landlord had chosen to reject the tenant's proposal out of hand, regardless of any implementing details. In sum, there is evidence sufficient for jury to find that (1) the landlord defaulted on its legal obligation to engage the tenant in a discussion of her request for a reasonable accommodation, and that (2) the land-

---

**66.** In *Giebeler,* a disabled prospective tenant, whose income was not sufficient to justify the listed rental, asked the landlord to waive its policy against co-signers on a lease, in order to permit his mother, who was financially able, to sign the lease with him and thereby assure the landlord the necessary financial security. The court was not prepared to say that this request for waiver was "reasonable on its face," because there could be cases where a co-signer would not solve the problem; thus, the court ruled for the tenant on "the particular facts." *Id.,* 343 F.3d at 1158. In contrast, in the present case, the proffered "clean and keep clean" accommodation would appear "on its face" to be a reasonable response for "the run of cases" in which mentally disabled low income tenants, who are clients of the D.C. government, require assistance in keeping their apartments clean and the government has a fund for providing such assistance on an ongoing basis. Thus, in a case of this kind, the court may be less likely than the court in *Giebeler* to evaluate the tenant's initial showing by reference to "the particular facts."

**67.** *Supra* note 22 and accompanying text.

lord refused to grant the requested accommodation, which the landlord clearly understood and which, if implemented, would have cured the tenant's default and prevented it from recurring.

Under such circumstances, the landlord's default and refusal will permit a reasonable accommodation defense to go forward if the tenant's request—while perhaps lacking details that might be necessary to demonstrate feasibility if the landlord had pressed for particulars—is complete enough for a reasonable jury to find that the elements of the request, if implemented along the lines proposed, would provide an accommodation responsive to the tenant's handicap that would cure and continue to prevent her default. The landlord, after all, could have questioned feasibility, if indeed there were grounds for doing so, by engaging in the required dialogue. By declining to do so as the law requires, the landlord failed to demonstrate any missing element or other inherent defect in the tenant's proposal. The landlord thereby kept the level of specificity required to establish prima facie "reasonableness" at the minimum. In a case such as this, for example, the details about tenant cooperation, the strength of the government's commitment, and the frequency of cleaning would likely be spelled out with some precision when

the landlord participates and insists on particulars before deciding whether, from its viewpoint, the accommodation would be reasonable. But when the tenant offers a coherent, ostensibly feasible proposal which the landlord rejects out of hand without discussion in good faith, the landlord has little, if any, standing to complain that the tenant has not been particular enough to proceed with a reasonable accommodation defense before the jury. Here, the tenant has proffered that the D.C. government will clean the apartment and keep it clean. Prima facie that will solve the problem, absent input from the landlord that the proposal will not work, for example, without pinning down a specific, frequent cleaning schedule.

■ Case law on the landlord's obligation to open a dialogue with a disabled tenant who requests a "reasonable accommodation" has focused on the landlord's failure to inquire about the extent of the illness,[68] or about the responsiveness of the requested accommodation to that illness.[69] The reasoning in such cases, however, supports our conclusion in the case at hand: that when a tenant proposes a coherent, ostensible feasible accommodation responsive to her handicap, the burden shifts to the landlord to ask for whatever additional details it considers necessary to evaluate

68. *Jankowski Lee & Assocs., supra* note 22, 91 F.3d at 894–895 (when landlord knew of tenant's disability, MS, but denied request for parking accommodation because landlord was not aware of extent that tenant's condition affected his mobility, landlord violated duty under Fair Housing Act to inquire further to ascertain details necessary to evaluating tenant's request; denial of accommodation without further inquiry about the extent of injury was "simply a ruse to avoid the penalty for violating the FHA").

69. *Auburn Woods I Homeowners Ass'n, supra* note 22, 121 Cal.App.4th at 1598, 18 Cal. Rptr.3d at 683 (Landlord knew of tenants'

clinical depression but would not accommodate their request for permission to keep their dog for companionship; landlord would allow only a cat. In applying California law that tracked federal Fair Housing Act, court held that landlord failed in its obligation to inquire as to why tenants insisted a dog was necessary. If landlord "needed additional information" about tenants' "need to keep Pooky, it was obligated to request it." The landlord "could not simply sit back and deny request for reasonable accommodation because it did not think sufficient information had been presented.").

that proposal.[70] A landlord's obligation to elicit additional information about a basically understandable accommodation is no different from its obligation to fill out the details about a tenant's announced illness or elicit her reasons why a requested accommodation will alleviate her handicap.

■ In addition to the foregoing analysis, it is clear from the record that any more detail proffered by the tenant to the trial court would have been fruitless in any event, for the court ruled against the tenant, as a matter of law, on three alternative—and, in our view, legally erroneous—grounds: that the requested accommodation was vague and untimely, was precluded (*i.e.*, made legally irrelevant) by the health and safety exception, and failed of proof from the lack of high quality expert testimony. Each of these threshold rulings would likely have forestalled further inquiry into whether any kind of stay, coupled with a cleaning effort, would have been reasonable.

In sum, a reasonable jury could find that the landlord did not cooperate, as required by law, and thus never entertained tenant's counsel's representation—made later in the trial court—that his D.C. government witnesses, Sutton and Byrd, who had a client relationship with the tenant, could "satisfy" the landlord's need for an apartment cleaned on an "ongoing" basis. Furthermore, the trial court focused primarily on issues at the pretrial hearing that led to erroneous rulings against the tenant on grounds other than the reasonableness of the requested accommodation. Under these circumstances, we conclude that the tenant must be allowed to proffer her reasonable accommodation defense anew for trial court consideration. .

In reconsidering the tenant's proffer, the trial court will have to apply the formulations for "reasonableness" discussed above and may eventually have to determine what formulation should be used for instructing a jury. We have not had to do so here, nor has the issue been briefed to the point that we would feel comfortable in doing so. We are satisfied that the trial court, on remand, will be able to receive whatever assistance is necessary from the parties to resolve this aspect of the case.

Finally, the fifth requirement for a prima facie case (landlord's refusal to make a reasonable accommodation) easily presents a jury question on this record. Thus far, no one has disputed that the landlord declined to agree to the requested accommodation, even at the beginning of June two weeks before trial, when the landlord's counsel for the first time undertook to discuss the matter. A jury reasonably could find that in those discussions, landlord's counsel rejected any stay that might keep the tenant in the apartment after the end of August or early September, even though the landlord had learned at the pretrial hearing, if not earlier, that the tenant would not contest eviction if the apartment, once clean, reverted to an unsanitary condition.

## IV. Response to Dissents

### A. Judge Schwelb

Judge Schwelb argues that the tenant—whom he characterizes as a "purported

---

70. At least one court has held that a landlord has a duty to try to accommodate a mentally ill tenant even when the particular accommodation requested is not feasible. *Cobble Hill Apts. Co., supra* note 22, 1999 Mass.App. Div. 166 (when mentally disabled tenant, who caused disturbances, asked for transfer to apartment in building away from downstairs neighbor who had complained, and landlord denied request, court held that landlord violated reasonable accommodation requirement of federal Fair Housing Act by failing to consider other accommodations. "The fact that a tenant does not request a specific or suitable accommodation does not relieve a landlord from making one, particularly when the tenant is handicapped by a mental condition").

victim" of unlawful discrimination who "wanted nothing at all to do with the case," and for whom the majority offers not "a single word of criticism"—was not entitled to a reasonable accommodation for a mental disability. He offers essentially four reasons: (1) the landlord had no "obligation to engage in a dialogue" with a tenant who the landlord believed "was not suffering from a relevant 'handicap' within the meaning of the Fair Housing Act" and who, in any event—"as a matter of law"—"was not a 'qualified' handicapped person"; (2) there was insufficient evidence that if the " 'eviction was delayed, [she] could conform [her] conduct to the terms of [her] lease' "; (3) the case had gone on too long, to the great discomfort of other tenants; and (4) the tenant's defense must fail in any event because she was "nowhere to be found."

As to the first, the dissent premises the reasonableness of the landlord's belief that the tenant was "not suffering from a relevant 'handicap' " on the trial court's finding that the tenant "had *not* been shown to be suffering the kind of mental impairment which would prevent her from maintaining a sanitary apartment." We have rejected that finding, however, as too narrowly premised on the absence of a "specific diagnosis" of mental illness, rather than on the more general "mental impairment" discernible even by lay persons, such as Ms. Reid, the landlord's representative who referred the tenant to St. Elizabeth's hospital.[71] The dissent's other basis for concluding as a matter of law that the tenant was not a " 'qualified' " handicapped person is the *Andover Housing Authority*[72] case. That decision defined "qualified,"

however, by reference not to the nature of the illness but to whether "more than reasonable modifications," *i.e.*, an "undue burden," would be imposed on the landlord in accommodating the tenant.[73] Plainly, no undue burden on the landlord is called for here; the only accommodation requested is a brief continuance of the eviction proceeding to test whether the tenant can follow through successfully with a government subsidized program to clean the apartment and keep it clean, failing which the tenant concededly would have to leave.

The dissent's second concern—that the evidence was insufficient to show that the tenant could conform her conduct to the terms of the lease—is, we believe, premature. Like our colleague, we have noted the tenant's failure to proffer "the kinds of details that ordinarily would be required to convince a fact-finder that the tenant's proposal assuredly was reasonable." On the other hand, we believe that enough was proffered—namely, a request for stay of the proceeding for a period long enough for the D.C. government to clean the premises and demonstrate a commitment to keep it clean—that the landlord was required to open a dialogue with the tenant to fill in whatever details it believed were lacking. The evidence is sufficient for a finding that the landlord declined to do so. Accordingly, the tenant's proffer, without a timely, meaningful response by the landlord, could not simply be rejected out of hand. On remand, given a proper understanding of the law, the trial court will be in a position to determine whether a jury could reasonably find that the tenant's proffered request for accommodation was clear and coherent enough, in light of

---

**71.** We also noted that the tenant received Supplemental Security Income benefits which in themselves usually suffice to show disability under the Fair Housing Act. *See* text at *supra* note 47.

**72.** *See supra* note 22.

**73.** *Andover Housing Auth., supra* note 22, 820 N.E.2d at 823–824.

the landlord's indifference to a dialogue to elicit additional details, that the accommodation should be deemed reasonable. Furthermore, we have noted that a more detailed proffer at the time would have been fruitless in any event because the trial court ruled against the tenant on three alternative, legally erroneous grounds. In sum, the tenant should have an opportunity to complete her proffer before the trial court reaches a conclusive determination as to whether the jury should hear her reasonable accommodation defense.

Third, as to delay, we have stressed that if the landlord had complied with the law by opening a dialogue with the tenant, through counsel, upon receipt of the February 20 letter, the entire matter might have been resolved much earlier than trial, eventually scheduled more than three months later in June. The tenant requested a "reasonable accommodation" for "mental illness"—an accommodation, according to counsel's letter, that would permit the District government's "intervention" to "assist her with her problems." That request was clear enough to impose a legal duty on the landlord to respond promptly. The landlord failed to respond, however, for more than three months and, indeed, was never willing to permit the tenant to remain in her apartment even if the District government were to clean—and maintain—the premises. The trial court itself recognized, moreover, that once the landlord had taken action to evict, the District government had a sound, fiscal reason not to intervene unless the landlord gave assurance that the tenant could remain if the government kept her apartment clean. In sum, because the landlord defaulted on its obligation to open a dialogue with the tenant until two weeks before trial and, even then, indicated that no accommodation would be acceptable, the

delay—with all the unfortunate burdens it imposed on other tenants—is primarily assignable to the landlord.

Finally, Judge Schwelb's complaint that this tenant "wanted nothing at all to do with the case" and was "nowhere to be found" misconceives the record and is unfair to the tenant. In the first place, there is no record basis for finding that the tenant had ever been missing from her apartment until a few weeks before the pretrial conference on April 17, 2002. Significantly, moreover, the record shows that she had returned by June 5, 2002—twelve days before trial—for a meeting with the District government's representatives, Messrs. Sutton and Byrd. Furthermore, counsel represented that the tenant had not shown up for trial because she thought that the trial was another trick to commit her (she apparently had survived an actual effort to commit her two weeks earlier). The tenant may have been elusive, but one cannot say as a matter of law that she was "missing—end of case." The tenant was not well; she had a mental illness that underlay the need for accommodation. In our view, therefore, she cannot be fairly charged under such circumstances with prejudicial indifference or deemed, definitively, a missing person. We cannot say as a matter of law that her lawyer, working with Messrs. Sutton and Byrd, was in no position to find her and convey hopeful news that would bring her to court.

Judge Schwelb relies on two cases that, in our judgment, make clear how the "reasonable accommodation" requirement should be treated and why the result here should be as the en banc majority, not his dissent, analyzes the case. In *Andover Housing Authority v. Shkolnik*,[74] reasonable accommodation was sought for an ill tenant and spouse who made excessive

74. *Supra* note 22.

noise. The housing authority responded immediately to the tenant's request for accommodation by investigating the feasibility of acoustical carpeting, a sound-absorbing drop ceiling, a room air conditioner so that the windows could remain closed during hot weather, and a stay of the eviction proceeding pending installation of an effective accommodation. The tenants, in the meantime, kept denying the noise and made no effort to engage in the interactive process, unlike the effort initiated by the tenant in this case. After a three-month stay of the eviction proceeding "so the tenants could continue to work with the authority and with their neighbors in order reasonably to accommodate all residents' needs," [75] the process failed and the court entered judgment of possession for the housing authority. The housing authority thus made the kinds of efforts to accommodate that the law requires—efforts that contrast sharply with the landlord's failure in this case to join the interactive process required under the Fair Housing Act.

In the other case on which our colleague relies, *Arnold Murray Construction, L.L.C. v. Hicks*,[76] the Supreme Court of South Dakota sustained a trial court judgment of possession, rejecting a reasonable accommodation defense proffered by a tenant who was accosting others in his building with "emotional outbursts, verbal threats, nude appearance and other offensive conduct." [77] There, the court accepted the line of authority confirming that "Congress intended for landlords to attempt reasonable accommodations, even when the tenant is a direct threat to the health and safety of other tenants, if those accommodations will eliminate or acceptably minimize the risks posed by that tenant." [78] But the court concluded that the accommodations requested by the tenant dealt only with "parking" and "controlled access door issues," not at all with his threats and other offensive conduct [79]—a situation entirely different from the present case, in which the tenant's proffered accommodation, if successfully implemented, would eliminate the threat to health and safety from an unclean apartment.

With all respect due, therefore, we cannot accept the portrayal of this case, factually and legally, presented in this dissent.

### B. Judge Glickman

Judge Glickman's dissent rests on the proposition that the tenant's request for accommodation "was simply too vague to rise to the level of a *bona fide* request for a reasonable accommodation under the Fair Housing Act." Judge Glickman does not dispute, however, that the tenant requested a stay of the eviction proceeding for the period reasonably required for the D.C. government to clean up the apartment and for the tenant to demonstrate, through the continuing help of the D.C. government, that she would keep it clean—failing which she would not contest eviction. Nor does our colleague dispute that an apartment once cleaned, and kept clean on an ongoing basis, would erase the legal justification for the landlord's notice to cure or quit, thus cure the tenant's default, and forestall similar default in the future. Under the circumstances and prevailing case law, that proffer is specific enough. See *supra* at 1133–38.

---

75. *Andover Housing Auth.*, 820 N.E.2d at 820.

76. *Supra* note 30.

77. *Arnold Murray Constr., L.L.C., supra* note 30, 621 N.W.2d at 176.

78. *Id.* at 175 (citing *Roe v. Sugar River Mills Assocs., supra* note 27, and *Roe v. Housing Auth. of Boulder, supra* note 27).

79. *Id.* at 176.

We have explained at length why we cannot conclude that the evidence proffered by the tenant in support of her request was insufficient for a jury to find that the tenant's proposal was "possible," or "reasonable on its face" or "in the run of cases," or even "reasonable on the particular facts," whichever of these case-law formulations for reasonableness were to be applied. See *id.* And our inability to rule against the tenant as a matter of law becomes especially clear in light of evidence that the landlord failed in its legal obligation—an obligation that Judge Glickman effectively reads out of the law—to open a dialogue with the tenant to elicit whatever additional specifics the landlord deemed necessary to evaluating the tenant's proposal. We have also explained, moreover, that a landlord's failure to engage in the required dialogue relieves a tenant from any need to proffer additional specifics beyond those required for a coherent, ostensibly feasible proposal that would allow a reasonable jury to find that if all its elements were implemented, it would accommodate the tenant's handicap and cure her default, presently and for the future.

Contrary to our reading of the record, however, Judge Glickman states that "[p]rior to trial, when a productive dialogue was still possible, the landlord's counsel solicited the 'details' of a suitable accommodation from Ms. Douglas's counsel, and her counsel could not provide them." In our view, that statement summarizes the situation lopsidedly. On this record, a jury could reasonably find that the landlord's counsel, rather than soliciting details, essentially stonewalled the tenant's counsel by waiting over three months to discuss the matter and then by stating, two weeks before trial, "that his proposal simply lacked any specifics for us to really make an evaluation on." Landlord's counsel then rejected the proffered D.C. government cleanup on the ground that tenant's counsel "had no authority to speak for the D.C. government" (even though counsel's pretrial testimony represented that his government witnesses, Sutton and Byrd, could "satisfy" the landlord in this regard). The landlord's counsel thereafter declined to discuss the matter further. This pretrial behavior by counsel for the landlord, coupled with counsel's statements in the trial court, provides the basis for a reasonable jury finding that the landlord did not make a good faith effort to enter the required dialogue with tenant's counsel as to reasonable accommodation. We are satisfied, therefore, that under these circumstances the trial court would have a basis for sending the tenant's defense to the jury under the authority of *Jankowski Lee & Assocs.* (a case Judge Glickman cites) and its progeny.[80]

Judge Glickman, like Judge Schwelb, stresses the difficulty that the tenant's counsel had in finding his client during the days immediately before trial—a situation, he says, that meant "a meaningful dialogue of the sort envisioned by the majority ceased to be possible." He then adds a footnote stating, with apparent reference

---

80. *Supra* note 22. We have found no basis for Judge Glickman's statement—citing only *Jankowski* with a *cf.* signal—that a landlord's failure to open a dialogue with a tenant who requests a reasonable accommodation will not be "material" or "result in liability" (and thus will be excusable) unless the landlord's indifferent behavior not only "operates as a disingenuous excuse for not granting that request" but also "thwarts the development,

presentation or evaluation of the tenant's request." Even if that two-pronged formulation were to state the law correctly, however, we are satisfied that, on this record, a reasonable jury could find the requisite disingenuousness, as well as landlord behavior that thwarted the presentation or evaluation, if not the development, of the tenant's request.

to the two weeks in June before trial, that the tenant's "unavailability for reasonable accommodation discussions ... was determinative of everything, for it made it impossible for her counsel even to propose a reasonable accommodation for the landlord's consideration." Those two statements ignore that the landlord's counsel concededly had refused any dialogue with the tenant's counsel for a period of months after a request for reasonable accommodation had been made, and they further ignore the landlord's obligation to commence that dialogue promptly, and certainly enough before a trial to permit a good faith exchange. Although he refers to the tenant's absence for "several weeks" before the April 17 pretrial conference, Judge Glickman does not claim that the tenant was unavailable during the entire period when the landlord was aware of her request, through counsel, for a stay coupled with a D.C. government cleanup. Significantly, he does not dispute the evidence that the tenant was available for a meeting with D.C. government representatives Sutton and Byrd on June 5, 2002, within days after the landlord first acknowledged the request for reasonable accommodation. She presumably would have been available to her counsel then as well. Furthermore, as noted above, there was evidence from which a reasonable jury could find that the landlord declined in any event to engage in meaningful discussion with the tenant's counsel toward reasonable accommodation—the kind of lawyer-to-lawyer discussion that did not depend on the tenant's presence at every session. By focusing primarily on the period immediately before trial, therefore, our colleague overlooks the tenant's availability from time to time during the much longer period after accommodation had been requested and the landlord had an obligation to respond. Accordingly, by emphasizing that a "meaningful dialogue *ceased* to be

possible," our colleague in effect is claiming that the landlord won a game of "gotcha": the tenant's apparent unavailability from the day after she met with Sutton and Byrd (June 6) to the trial date (June17) erased all legal significance from the landlord's own multi-month unavailability. The law applicable here does not work that way.

Judge Glickman concludes, in any event, that if the tenant had been allowed to put on her discrimination defense it "would have fallen flat on its face, because she had no evidence to present." To the contrary, as indicated earlier in response to Judge Schwelb, if a trial had begun in which the tenant was allowed to put on her reasonable accommodation defense, one cannot say on this record that she assuredly had no evidence to present. The D.C. government representatives, Sutton and Byrd, were available. The landlord's representatives also were available. And who is to say that the tenant's counsel would not have been able to find his client with the good news that her defense would go forward (assuming that her presence was essential to that defense)? The fact that counsel on a number of occasions showed caution in answering questions about how long it would take to locate his mentally ill client should not be held determinative of an inability to find her altogether. And we cannot say that the trial court would not have granted a reasonable continuance for that purpose, upon request, if the court, based on a correct understanding of the law, in contrast with the understanding relied on at trial, ruled that the reasonable accommodation defense could go forward.

It takes two, landlord as well as tenant, to work out a reasonable accommodation. And, as we have explained, the landlord was legally obligated to discuss the matter in response to the tenant's counsel's letter of February 20, 2002, and certainly there-

after when the tenant expressly requested the stay and proffered a cleanup, and continued cleaning, by the D.C. government. On this record, a reasonable jury could find that the landlord did not meet its obligation to come to the table when the tenant made her request. As a consequence, the tenant was entitled to have the trial court determine whether she had proffered enough detail in her request that a jury could reasonably find that her proposed accommodation was reasonable because it was responsive to her handicap and satisfied applicable case law formulations. Accordingly, the tenant must have a renewed opportunity to proffer her defense to the trial court.

## V.

Because we agree with the tenant that the trial court erred in its rulings, we must reverse and remand the case to the trial court to permit the tenant to show, by affidavit or similar proffer, that triable issues of fact remain as to whether her mental impairment can be accommodated in a manner consistent with the health and safety of the other tenants.

*So ordered.*

FARRELL, Associate Judge, with whom TERRY, Associate Judge, joins, concurring:

I join the court's opinion because it impressively and correctly resolves issues arising at the intersection of this jurisdiction's landlord and tenant law and the federal Fair Housing Act, and because I understand it to hold, on the ultimate issue of reasonable accommodation under the Act, just what it states in Part V: that rejection of the tenant's discrimination defense as a matter of law was premature, and that a remand of the case is necessary "to permit the tenant to show, by affidavit or similar proffer, that triable issues of fact remain as to whether her

mental impairment can be accommodated in a manner consistent with the health and safety of the other tenants." *Ante* at 1144. The tenant has not yet made, and has not had sufficient opportunity to make, that showing because, as the court explains, "the trial court focused primarily on issues at the pretrial hearing that led to erroneous rulings against the tenant on grounds other than the reasonableness of the requested accommodation." *Ante* at 1138. I refer in particular to the trial court's conclusions that the requested accommodation was untimely, was made legally irrelevant by the health and safety exception, and failed of proof from the lack of high quality expert testimony. Because these rulings could well have operated to prevent further inquiry into whether a stay of eviction and services by the District of Columbia such as the tenant—in broad terms—had proposed would be a reasonable accommodation of her disability, the court is correct that "the tenant must be allowed to proffer her reasonable accommodation defense anew for trial court consideration." *Ante* at 1138. For that defense to be worthy of jury consideration, however, it will have to come with flesh on the bones that it so far does not have. Unless the tenant can offer concrete and specific assurances by the District regarding its willingness to assist her in maintaining the apartment in a clean and safe condition, the trial court will be entitled to reject the defense of reasonable accommodation as a matter of law.

SCHWELB, Associate Judge, with whom WASHINGTON, Chief Judge, and GLICKMAN, Associate Judge, join, dissenting:

## I.

## INTRODUCTION

I wrote about this controversy in some detail in my dissenting opinion when the

case was before the division, *see Douglas v. Kriegsfeld Corp.,* 849 A.2d 951, 971–99 (D.C.2004)(*Douglas I*), and for the most part, I continue to adhere to the views there expressed.[1] The case is in a somewhat different posture now, for a remand, as ordered by the en banc court is, in my view, more reasonable than the ruling of the division that Ms. Douglas' counsel should have been permitted, without further inquiry, to present a Fair Housing Act defense.[2] For the reasons set forth herein, and for those described in my dissent in *Douglas I,* however, I continue to believe that the trial court's decision should be affirmed. Specifically, in light of

1. the severity and duration of Ms. Douglas' violations of her lease and of the Housing Regulations, and the consequent threat to the health and safety of others;

2. the failure of the District of Columbia government to do anything about the conditions for at least a year;

3. the absence of any assurance from the District regarding what, if any, remedial measures it proposed to take,

and when and how often it would take them; and

4. Ms. Douglas' lack of cooperation and disappearance from the scene,

I would hold that the "accommodation" proposed by Ms. Douglas' counsel was unreasonable as a matter of law.

## II.

## THE FAIR HOUSING ACT AND THE COURT'S MISALLOCATION OF BLAME

Congress initially passed the Fair Housing Act of 1968 in the exercise of its authority to eliminate badges and incidents of slavery. *Jones v. Mayer Co.,* 392 U.S. 409, 442–43, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). The legislation was enacted in the wake of Dr. Martin Luther King's assassination in order to right a grievous wrong; racial discrimination in housing had "herd[ed] men [and women] into ghettos and [had made] their ability to buy [or rent] property turn on the color of their skin." *Id.* Originally, the Act prohibited only discrimination based on race, color, religion, or national origin, but today it also provides protection from discrimina-

1. The trial judge held that the tenant's purported experts, James Sutton and Damon Byrd, were not qualified to testify that Ms. Douglas had a mental illness which prevented her from maintaining a sanitary apartment. He so ruled, in part, because neither man knew or understood the meaning of the term "mood disorder NOS," the malady with which Ms. Douglas had been diagnosed by a psychiatrist who was not called to testify. The division majority characterized the judge's exercise of discretion as "manifestly erroneous," *Douglas I,* 849 A.2d at 964, a description that, for reasons set forth in my dissent, *id.* at 979–84, I regarded (and continue to regard) as an indefensible substitution of the majority's favored result for a perfectly legitimate discretionary call by the trial judge.

 Fortunately, aided by an excellent discussion of this issue in the brief filed on behalf of Ms. Douglas in the en banc court, the majori-

ty has abandoned the division's troubling articulation and at least some of the division's reasoning. Although I am still not in full agreement with the en banc majority's treatment of the issue, see Part VII, *infra,* I am prepared to assume, *arguendo,* that Ms. Douglas' counsel presented enough evidence to go to the jury with respect to whether his client suffered from a mental handicap within the meaning of the Act.

2. A remand is defensible because the trial judge's ruling was not based on an explicit finding that counsel for the tenant had failed to propose a reasonable accommodation. Based on the record, however, I have no doubt that in the judge's view, as a matter of law and on the record before the court, the proposal made on behalf of the tenant did not constitute a "reasonable" accommodation within the meaning of the Act.

tion based on sex or handicap. Indeed, landlords are required to accommodate the special needs of handicapped tenants, so long as the accommodation is reasonable. But true to its noble origins, the Fair Housing Act has always been, and must remain, a *Fair* Housing Act. Specifically, it must be applied in a way that is fair not only to complaining tenants but to landlords and other tenants as well.[3] Further, governmental intrusion in any landlord's business must be limited to the minimum required to achieve equal opportunity. *United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 228–29 (5th Cir.1971) (model decree).

In my opinion, the Act is wrenched from its moorings as an instrument of justice if the court accepts, as it apparently does, the premise on which this action is founded, namely, that a tenant's alleged mental illness requires the toleration, for an indefinite period, of conduct detrimental to the well-being of others. *See generally* Jennifer L. Dolak, Note, *The FHAA's Reasonable Accommodation & Direct Threat Provisions as Applied to Disabled Individuals Who Become, Disruptive, Abusive, or Destructive to Their Housing Environment*, 36 IND. L. REV. 759 (2003) (hereinafter "*Reasonable Accommodation & Direct Threat*")." Traditionally, in the landlord-tenant context, the Act has provided protection to applicants for tenancy and tenants who have done no harm to the landlord or to other tenants, and who have suffered invidious discrimination (or who, in some cases, have been denied a reasonable accommodation not detrimental to the well-being of other persons) on grounds

prohibited by the Act. Here, we are being asked to uphold the perceived prerogatives of a tenant who has imperiled the health and safety of her fellow-tenants and undermined their quality of life. Where, as in this case, the party seeking an accommodation has already inflicted harm upon innocent third parties for a significant period of time, any accommodation that will inevitably further prolong the existence of this harm is, in my opinion, presumptively unreasonable as a matter of law. *See Andover Hous. Auth.*, 820 N.E.2d at 825 ("reject[ing] the idea that [where tenants have failed to conform their conduct to the lease], indefinite requests for more time to address a disabling condition are reasonable") (citation and internal quotation marks omitted).

The appellant, Evelyn Douglas, is an abuser of alcohol, and she is also alleged to be suffering from a "mood disorder." Soon after moving in to her apartment, she turned it into a filthy, urine-filled, rodent-infested nightmare. The conditions in the apartment generated a stench which could readily be detected from the staircase leading down to the unit. This situation, a patent threat to health and safety, continued unabated for about a year, in obvious violation of the Housing Regulations and the lease. A District of Columbia government representative from Adult Protective Services (APS) was visiting Ms. Douglas on a regular basis, and he observed her circumstances first hand. APS, however, did nothing about the unsanitary conditions.

---

3. "A 'reasonable accommodation' is one which would not impose an undue hardship or burden on the entity making the accommodation," *Andover Hous. Auth. v. Shkolnik*, 443 Mass. 300, 820 N.E.2d 815, 821 (2005) (citation omitted), or on other tenants. *Id.* at 824 n. 17. "[A] reasonable accommodation does

not entail an obligation to do everything humanly possible to accommodate a disabled person." *Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1047 (6th Cir.2001) (quoting *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir.1995)).

The basic claim made on the tenant's behalf is that the condition of her apartment and the adjacent area resulted from a mental illness which is said to have prevented her from keeping the place clean. Ms. Douglas was offered psychiatric treatment, but as her counsel acknowledged, she refused it. It appears to be undisputed that Ms. Douglas denied the landlord access to her apartment. A Neighborhood Legal Services attorney represented her conscientiously and vigorously, at no charge. Nevertheless, Ms. Douglas refused to cooperate with her counsel; instead, she all but disappeared from the scene, thus eliminating any possibility of productive settlement negotiations. Significantly, the proposed accommodation that her attorney belatedly suggested to the court depended entirely on what the District of Columbia supposedly was going to do, but the District had provided nothing at all to the court in writing or even orally.

Ms. Douglas' attorney acknowledged to the judge on the eve of trial that he could not speak for the District, and he was unable to make any representation as to when, how thoroughly, or how often the District's agents would clean the premises if, indeed, they proposed to clean them at all; unfortunately, they had not made any improvement in the condition of the unit or its surroundings during APS' year of contact with Ms. Douglas. On the day before the trial, counsel responded to the judge's question regarding how much time was needed to put the unit in order by stating that his client was "mentally ill." The tenant herself was unavailable to testify or to agree to any negotiated resolution. Absent a judgment of possession in favor of the landlord, there was no prospect at all for an early end to the unfortunate and protracted status quo.

Yet, as the majority apparently views the record, the sole party at fault was the landlord, whom the court unfairly accuses of refusal to negotiate. I cannot agree with this assessment. On the contrary, for the entire period with which we are dealing in this case, it was the landlord and Kriegsfeld's other tenants who suffered injury at the hands of Ms. Douglas, and not the other way around. The residents of the apartment house were compelled, as a result of Ms. Douglas' actions, to spend a year in the vicinity of unsanitary, unhealthy, and unlawful conditions which Ms. Douglas had created. The year-long impact upon the quality of the lives of those who had to endure these conditions cannot simply be ignored—the world did not begin on the trial date. The tenant has the burden of proving that a proposed accommodation is reasonable, *Groner*, 250 F.3d at 1044; *see also Andover Hous. Auth.*, 820 N.E.2d at 822, and as a matter of law, a proposal which was not supported even by a minimally specific or credible proffer, and which would have indefinitely prolonged the undeserved plight of Ms. Douglas' landlord and fellow-tenants, could not be shown to be a reasonable one.

## III.

### THE TENANT'S VIOLATIONS

The circumstances giving rise to this case are poignant; a woman with an alcohol addiction and related problems was living in deplorable conditions; the District of Columbia government was aware of her circumstances for more than a year and did nothing at all about them. But Ms. Douglas' plight is not the whole story; an important subject to which the majority has paid quite limited attention is rather a basic one: What did Ms. Douglas do to cause the landlord to seek to evict her? The answer is central to this case, for it defines the conditions that a reasonable

accommodation must address. The melancholy truth, as we have seen, is that Ms. Douglas not only turned her apartment into an unsanitary and uninhabitable unit, but by her neglect, she also generated a disagreeable odor that polluted the surrounding area. There was also rodent infestation. By the time the case went to trial in June 2002, this situation had continued unabated at least since July 2001, and perhaps from the beginning of Ms. Douglas' tenancy in January 2001. Although the court does not mention it, it is indisputable and, as far as I know, undisputed that Ms. Douglas was in protracted and severe violation of several of the District's Housing Regulations requiring tenants to maintain their units in sanitary condition. *Douglas I,* 849 A.2d at 976–77 n. 12.[4] The purpose of these regulations is to protect the public health. *See* 14 DCMR § 800.09 ("Premises maintained in violation of this chapter create a danger to the health, welfare or safety of the occupants and public, and constitute a public nuisance."). Perhaps *de minimis* violations of the Housing Regulations do not constitute a danger to health and safety, but Ms. Douglas' violations were hardly *de minimis.*

It would be unfair to say that the majority has ignored this subject altogether. The court's lengthy opinion contains almost three lines about it on page 3. Not content with that, the majority twice refers to Ms. Douglas' unit as a "filthy apartment," and there may even be one or two other oblique references. Obviously, though, the majority does not regard the trashing and fouling of the premises or the

severe and protracted violation of the Housing Regulations as having much bearing on the proper analysis of this case. In particular, the court apparently thinks it unnecessary even to mention the possibility that conditions of this level of severity, and of such extended duration, just might require *immediate* attention, and that the need for prompt amelioration should be a significant part of the court's calculus in determining whether the "accommodation" proposed by counsel on behalf of the absent tenant was "reasonable." My view, on the other hand, is that where a tenant has created conditions as extreme as those in and around Ms. Douglas' unit, and where these conditions have continued unabated throughout her tenancy (and after the APS representative began to visit her) to the detriment of the health and safety of Ms. Douglas' neighbors, this reality is *central* to the determination whether there is any appreciable prospect that a proposed accommodation is adequate or will work.

The majority's marginalization of Ms. Douglas' role in creating the problem is also important for another reason. So far as I can tell, the majority opinion does not contain a single word of criticism of Ms. Douglas, or any suggestion that anybody but the landlord was to blame for anything. The representatives of the District of Columbia government, who observed the conditions in and near Ms. Douglas' unit for a year without initiating any remedial measures, likewise emerge blameless from the court's accounting.[5] From the majority's perspective, the landlord (Kriegsfeld) appears to be the sole villain of

---

4. The nature and extent of Ms. Douglas' violations, and the specific regulations which she violated, are set forth in detail in my dissenting opinion in *Douglas I.* To save a tree or two, I do not repeat this exposition here.

5. According to the majority, "the District government had a sound, fiscal reason not to

intervene unless the landlord gave assurance that the tenant could remain if the government kept her apartment clean." The fact is that Mr. Byrd of APS had regular contact with Ms. Douglas for many months before the suit for possession was brought, and did nothing about the condition of her unit when she was *not* under threat of eviction. The Dis-

the piece,[6] and counsel for Ms. Douglas, demonstrating the quality that makes "chutzpah" such an expressive noun, actually requested in Ms. Douglas' counterclaim that the landlord be held liable to her for damages!

Yet it was Ms. Douglas who caused the unsanitary conditions and the sickening smell on the landlord's property, not vice versa, and her unfortunate alcohol addiction and mood disorder did not lessen the threat to health and safety. Assuming, as I do for purposes of this opinion, that Ms. Douglas was suffering from a handicap within the meaning of the Fair Housing Act, the law surely has not reached the point where alcoholics and people suffering from mood disorders or other comparable afflictions are not only protected by the Act, but also relieved of any responsibility whatever for their actions. If perverse incentives are to be avoided, there must be some limit to the "lenient treatment [that may be] secured for [Ms. Douglas] by her own insobriety." *In re Soininen,* 853 A.2d 712, 729 (D.C.2004). Ms. Douglas, whose problems could well lead to homelessness, is certainly a person deserving our sympathy, but if she was a victim here at all— and this is a big "if"—she was not *only* a victim, nor was she the *only* victim; Kriegsfeld and Ms. Douglas' fellow-tenants were victims too. In failing to recognize that this is so, the majority paints a picture that, from my perspective, is disconcertingly askew.

## IV.

### HEALTH AND SAFETY

The Fair Housing Act provides an exception to the landlord's duty to offer a reasonable accommodation where the tenancy constitutes "a direct threat to the health and safety of other individuals." 42 U.S.C. § 3604(f)(9). The legislative history makes it clear that this exception may not be based on stereotypes:

> Any claim that an individual's tenancy poses a direct threat and a substantial risk of harm must be established on the basis of a history of overt acts or current conduct. Generalized assumptions, subjective fears, and speculation are insufficient to prove the requisite direct threat to others. In the case of a person with a mental illness, for example, there must be objective evidence from the person's prior behavior that the person has committed overt acts which caused harm or which directly threatened harm.

H.R. REP. No. 100–711, at 29 (1988), *reprinted* in 1988 U.S.C.A. A. No. 2173, 2190. In the case of Ms. Douglas, however, there is "ample objective evidence from [her] prior behavior" that she has committed "overt acts which caused harm or which directly threatened harm." I think it incontestable that the violations of the Housing Regulations caused by Ms. Douglas— the filth, the smell, the rodent infestation—constituted a direct threat to health and safety. The majority does not necessarily disagree, but holds that this exception to the landlord's obligations under the Act applies only where the threat persists after an attempt has been made to reach a reasonable accommodation.

In my opinion, it is simplistic and illogical to adopt an inflexible rule providing that an attempt to negotiate a reasonable

---

trict's inaction cannot reasonably be blamed on the landlord's suit for possession.

**6.** The trial judge noted that the landlord "was not out for blood," was "sorry for the defendant," "and not anxious to see this poor woman out on the street homeless." *Douglas I,* 849 A.2d at 987 n. 26. The majority quotes this passage. As villains go, Kriegsfeld is pretty mild!

accommodation is *always* required before the direct "threat to health and safety" provision can come into play. On the contrary,

> [this] determination must surely depend on several factors, including the severity and duration of the danger and the anticipated amount of time required to explore and implement the requested accommodation. Obviously, if the danger to person and property is imminent, indefinite delay cannot be tolerated. In the present case, the smell, the threat of rodents and vermin, the fire hazard, and the other severe problems in [and near] Ms. Douglas' apartment were sufficient, in my view, to warrant the court's refusal to countenance their continuation for another minute, and especially for a period of time that even counsel for Ms. Douglas was not prepared to estimate. I am therefore satisfied that there was no error in the trial judge's analysis of this provision of the statute.

*Douglas I,* 849 A.2d at 996 (dissenting opinion). As the Supreme Court of South Dakota put it in a nutshell, "to require an automatic attempt to accommodate a dangerous tenant would needlessly place other residents in the tenant's building at risk." *Arnold Murray Constr., L.L.C. v. Hicks,* 621 N.W.2d 171, 175 (S.D.2001).[7] In the present case, such a risk had already been in place for a long time when the trial judge was called upon to make his decision.

The existence of the "health and safety" provision vindicates the underlying assumption of fairness to all upon which the Fair Housing Act and other civil rights statutes are based. This is so because the provision was designed to protect persons in the kind of situation in which Ms. Douglas' landlord and her fellow-residents found themselves. In holding that after a year of filth, rodents, and stench, § 3604(f)(9) still does not protect Ms. Douglas' neighbors from further extension of the unhealthy and potentially perilous status quo, the court, in my view, gives the health and safety provision a far too crabbed construction. In this case, as in *Andover Hous. Auth.,* 820 N.E.2d at 825, "[t]here was simply a lack of evidence that if the tenant['s] eviction was delayed, [she] could conform [her] conduct to the terms of [her] lease."[8]

## V.

## THE DISTRICT GOVERNMENT'S ROLE

The purported "reasonable accommodation" presented to the trial court by counsel for the tenant was based entirely on what the District of Columbia government, and specifically the Office of Adult Protective Services, would supposedly do to remedy the unsanitary conditions in and around Ms. Douglas' apartment. There is no claim that Ms. Douglas herself could clean the unit and keep it clean. In fact, her attorneys maintain the exact opposite: she is supposed to be too mentally ill to accomplish this. Everything thus depended on APS.[9]

---

**7.** The majority's recitation, in its "Response to Dissent," of the factual scenario in the *Arnold Murray* case does not affect in the slightest the practical wisdom and common sense contained in the sentence that I have quoted from that opinion.

**8.** With respect to the timeliness *vel non* of Ms. Douglas' request, I find the issue more complicated than the majority does, and I reiterate the views that I expressed in *Douglas I,* 849 A.2d at 994–95.

**9.** If it depended on anyone else—*e.g.,* Ms. Douglas herself—then counsel for the tenant would really have been in a pickle, for by the time the case came to trial, Ms. Douglas had not been around for several months.

On June 17, 2002, the eve of trial, the tenant's attorney could not proffer anything in writing from the District as to what APS was prepared to do for Ms. Douglas. As counsel acknowledged to the judge, "I can't speak for the District." Although Damon Byrd, the APS representative, had been in court to testify on that very day, Ms. Douglas' attorney could not even proffer any oral assurance from the District as to when any cleaning by APS would begin, or how often or how thoroughly the unit and the surrounding area would be cleaned. The majority says little about the subject, but the severity of the Housing Code violations in and near the apartment was such that the situation obviously could not be remedied (or the unit kept clean and the foul odor permanently removed) by a visit every couple of weeks. Can anyone reasonably suppose, on this record, that the District and its representatives were prepared to come and clean the apartment and remove the stench more often than that, especially where the tenant was known to be difficult and uncooperative? If the District had been willing to do so, is it conceivable that Ms. Douglas' attorney would not have elicited this information from Mr. Byrd, or secured an affidavit, or had a lawyer from the District with him in court to make representations regarding what APS would do and when it would do it? In my view, it is self-evident that the answer to each of these questions must be a resounding "No!"

Aside from the obvious vagueness and lack of detail in the tenant's proposed accommodation, even on the day before the trial began, the history of this case made the prospect of effective action by APS minimal at best. Mr. Byrd of APS had been coming to see Ms. Douglas for over a year. His visits began long before November 30, 2001—the day the landlord's action for possession was brought.[10] According to Byrd's own testimony, the conditions in Ms. Douglas' unit were appalling. Nevertheless, throughout this entire period, there is no evidence that APS picked up a single piece of trash, washed a single dish, or took even the slightest measure to alleviate the unsanitary and unhealthy conditions in which Ms. Douglas was existing. As I pointed out when the case was before the division,

> the "accommodation" ultimately proposed by the tenant was contingent on actions by the District, which had dealt with Ms. Douglas for many months but had done nothing to resolve the situation, and on the cooperation of the tenant, who refused to cooperate and was nowhere to be found.

*Douglas I,* 849 A.2d at 973 (dissenting opinion).[11]

The past is prologue, and one might expect the court, in its discussion of the proposal by the tenant's counsel, to take into realistic consideration what the District had accomplished to date, namely, nothing. In fairness to the en banc majority (in contrast to the division majority),

10. According to Ms. Douglas' attorney, the District took the not especially humane position that it would not clean the unit while the suit was pending because Ms. Douglas might be evicted. For its part, the majority finds nothing unreasonable in the District's position (as represented by counsel for the tenant) that it would do no cleaning unless the suit was stayed, regardless of the threat to the health and safety of other tenants.

11. The majority asserts that much of the elapsed time during which the unsanitary conditions continued "was attributable to the normal requirements of the judicial process." But as I mentioned in my dissenting opinion in *Douglas I,* 849 A.2d at 994 n. 35, "nothing was stopping the tenant (or the District) from cleaning the apartment in the interim."

the remand order will provide the landlord with the opportunity, if Ms. Douglas becomes available and if an evidentiary hearing on remand is actually held, to emphasize this uninspiring history to the court before a Fair Housing Act defense can be presented to a jury.[12] Nevertheless, on the whole, the court treats APS' record of inaction as beside the point, tries to blame the landlord, and attempts to excuse that record on the irrelevant ground that Kriegsfeld's action for possession was pending for a part of the period when APS was visiting Ms. Douglas.

## VI.

## MS. DOUGLAS' NON-PARTICIPATION

Another feature of this controversy to which the majority ascribes remarkably little significance is that Ms. Douglas, the purported victim of unlawful discrimination in housing, wanted nothing at all to do with the case. The majority's principal discussion of this unusual fact is contained in footnote 4. There, the majority refers to "[t]he tenant's unavailability for settlement discussions *immediately before trial* " (emphasis added), and states that her unavailability "is not legally determinative of anything . . . ." In my opinion, the majority is mistaken about the facts, wrong about their legal significance, and unrealistic and impractical regarding the entire issue.

To begin with, Ms. Douglas was not merely unavailable, as the court suggests, "immediately before trial." On the contrary, by June 17, 2002, as the division majority acknowledged in *Douglas I*, 849

A.2d at 954 n. 1 (and, indeed, as the en banc majority concedes here, *ante* note 3), she had been effectively "missing" for quite a long time. Ms. Douglas did not attend the pretrial conference on April 17, 2002 (two months before trial), and, so far as I am aware, it is undisputed that she had been unavailable to her counsel for several weeks before that. Thus, although her attorney represented to the District's Department of Regulatory Affairs, in a letter dated February 5, 2002, that Ms. Douglas had been referred to outpatient treatment "and is prepared to continue any treatment that will improve her mental condition," *id.* at 997, counsel conceded in his brief to the division that she was "refusing any and all treatment by a psychiatrist," *id.* at 989; the assurance to the District was thus in error. Beginning several weeks before April 17, 2002 (either before or shortly after her attorney's February 20 letter to counsel for Kriegsfeld), Ms. Douglas was conspicuously absent from the fray—a non-participant in her own case.[13]

Contrary to the majority's ever-so-understanding and, as I see it, condescending view that a litigant's insistence on having nothing to do with a lawsuit regarding her own tenancy is inconsequential, common sense tells us that Ms. Douglas' absence made a great deal of difference. For example, the majority claims that the landlord violated the Fair Housing Act by not "opening a dialogue" in response to the February 20 letter from the tenant's attorney to Kriegsfeld's attorney. To catalogue all that is wrong with that assertion is not easy. I attempted to do so in some detail in my dissent in *Douglas I*, 849 A.2d at

12. In light of the legal principles set forth in this dissenting opinion, in Judge Glickman's dissent, and in the last two sentences of Judge Farrell's concurring opinion—opinions that represent the views of six of the nine judges—the prospects, on remand, of Ms. Douglas'

case reaching a jury (even assuming that she can be found) are slim indeed.

13. Apparently, Ms. Douglas met with the District's representatives some twelve days before the trial, refused to come to court, and made herself unavailable to her lawyer.

990–92, and I invite any interested reader to peruse the entirety of what I had to say.[14]

Both of the federal appellate courts that have addressed the subject have held that the landlord has no obligation under the Fair Housing Act to engage in an "interactive process" with the party claiming to be handicapped. *See, e.g., Groner,* 250 F.3d at 1047; *Lapid–Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Township of Scotch Plains,* 284 F.3d 442, 446 (3d Cir. 2002); *see also Andover Hous. Auth.,* 820 N.E.2d at 822 (no statutory obligation, but interactive process is the "optimal way"); *Reasonable Accommodation & Direct Threat,* 36 IND. L. REV at 772. As the court explained in *Groner,*

while some courts have imposed an obligation *on employers and employees* to engage in an interactive process, there is no such language in the Fair Housing Act or in the relevant sections of the Department of Housing and Urban Development's implementing regulations that would impose such a duty on landlords and tenants. *See* 24 C.F.R. §§ 100.200–.205.

250 F.3d at 1046 (emphasis added). The underlying premise on which the majority bases its opinion is thus seriously flawed; the majority imports into the statute and regulations something that is not there, and castigates the landlord for failure to comply with a non-existent requirement.[15]

---

**14.**

In this respect, the case differs materially from one involving, say, a blind person or a paraplegic, whose affliction is obvious and indisputable. Whether Ms. Douglas' alleged mood disorder constituted a handicap within the meaning of the Act was an open question when, according to my colleagues, the landlord violated that statute by pressing its suit to judgment. If, as the judge concluded, Ms. Douglas was not handicapped, then the landlord was not required to offer her an accommodation.

*Douglas I,* 849 A.2d at 993 n. 34 (dissenting opinion).

It is also significant that the claim that the failure of the landlord's attorney to respond to the February 20 letter violated the Fair Housing Act was first asserted by the division, not by counsel for Ms. Douglas. *Id.* I explained this in *Douglas I:*

According to the majority, the landlord violated the Act by not responding to a letter dated February 20, 2002, from the tenant's attorney, and thereby failing to engage in a "constructive dialogue" with the tenant. The majority asserts that the trial judge erred by not taking note of this failure on the landlord's part and by not ascribing fault to the landlord. This alleged trial court error comes "out of the blue," for no claim was made to the trial judge, or in this court, that the lack of a response to the tenant's letter violated the Fair Housing

Act. Moreover, the letter from the tenant's counsel on which my colleagues' theory rests is barely mentioned, if it is mentioned at all, in the tenant's brief, and never in reference to any claim of a refusal by the landlord to negotiate.

849 A.2d at 973 (footnote omitted).

**15.** *Jankowski Lee & Assocs. v. Cisneros,* 91 F.3d 891 (7th Cir.1996), relied on by the majority, is not contrary to *Groner* and *Lapid–Laurel,* but deals with a different issue. The court there held that if a landlord was skeptical about the tenant's claimed condition, "it is incumbent upon the landlord to request documentation or open a dialogue," *id.* at 895, about the condition. The court gave no indication that the Act requires the landlord to engage in a free-wheeling "interactive process," or to respond to every letter sent to the landlord on the tenant's behalf.

According to the "Joint Statement" of the Department of Justice and the Department of Housing and Urban Development, *Reasonable Accommodations Under the Fair Housing Act* (May 17, 2004), "[a]n undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation." Assuming, *arguendo,* that the February 20 letter constituted a "reasonable accommodation request," the landlord had no crystal ball, and Kriegsfeld therefore was not on notice of this "Joint

Assuming, contrary to the federal appellate decisions, that an obligation to engage in a dialogue exists, the landlord in this case was entitled to take the position that Ms. Douglas was not suffering from a relevant "handicap" within the meaning of the Fair Housing Act. This was not a situation involving, say, a blind or paralyzed tenant, whose affliction no rational person could question. Whether Ms. Douglas' condition placed her within the protection of the Act was a judgment call; indeed, the trial judge later found that Ms. Douglas had *not* been shown to be suffering the kind of mental impairment which would prevent her from maintaining a sanitary apartment. Even though this court has subsequently disagreed with the trial judge, this did not render the landlord's position unreasonable. There is surely no obligation to engage in a continuing dialogue with a tenant who is not handicapped within the meaning of the Act. But even if there were such a duty, any attempt by Kriegsfeld's attorney to initiate a dialogue would have served no useful purpose. As the majority acknowledges in its footnoted reference to Ms. Douglas' absence, her attorney told the court that he was "willing to entertain any settlement offer," such as the one that had been presented to him in advance of trial by counsel for Kriegsfeld, but that he "need[ed] to speak with her," *i.e.*, with his absent client, before responding to a proposal by the landlord. It was not the landlord who refused to negotiate, but the tenant, whose unavailability for several months made settlement on any terms unattainable.

Further, it would have been difficult, if not impossible, for Ms. Douglas' attorney to proceed to trial without having his client available. The landlord claimed, without any contradiction in the record, that Ms. Douglas had refused the landlord access to

her unit. Without Ms. Douglas' testimony that she would permit entry by Kriegsfeld and by APS, there would be no basis for a finding that any plan to clean the apartment and to keep it clean could succeed. Moreover, although Ms. Douglas' attorney had made proffers regarding what he deemed to be a "reasonable accommodation," Ms. Douglas was not available—and she therefore could not testify, let alone prove—that she would cooperate with any plan that her counsel had proposed or might propose. According to the majority, she considered the case a "trick" to have her committed, and she wanted nothing to do with it. Without her cooperation, the purported reasonable accommodation was a mirage.

## VII.

### THE UNREASONABLENESS OF THE PROPOSED ACCOMMODATION

Although it has prudently eschewed the division's notion that the trial judge's exercise of discretion regarding the qualifications of Sutton and Byrd was "manifestly erroneous," the en banc majority, viewing the record in the light most favorable to Ms. Douglas, holds that there was sufficient evidence to permit an impartial jury to find that Ms. Douglas was suffering from a mental handicap within the meaning of the Act. I acknowledge that, given the applicable "light most favorable" standard, this may fairly be termed a somewhat close call, and as I have previously noted, I am prepared to assume, in this opinion, that counsel for Ms. Douglas presented enough evidence to raise a jury question. Nevertheless, some additional comment is in order, for the nature of Ms. Douglas' condition affects both the harm done to the landlord and to the other

Statement" twenty-seven months before it was issued.

tenants and the reasonableness *vel non* of the proposed accommodation.

Although the point has not been addressed by the parties or in either opinion in the division, there is considerable question whether, on this record, Ms. Douglas is a "qualified handicapped person" who is entitled to protection under the Act. To paraphrase a passage from the decision of the Supreme Judicial Court of Massachusetts in *Andover Hous. Auth.,*

> [t]he term "qualified" handicapped person is not used in ... the Fair Housing Act, 42 U.S.C. § 3604(f)(2).... However, it is used in § 504 of the Rehabilitation Act, 29 U.S.C. § 794, to which [the Fair Housing Act] [is] analogous.... *We see little reason not to consider whether a plaintiff is a "qualified" handicapped person in the context of a housing discrimination claim "because many of the issues that arise in the 'qualified' analysis also arise in the context of the 'reasonable modifications' or 'undue burden' analysis.* That is, if more than reasonable modifications are required of an institution in order to accommodate an individual, then that individual is not qualified for the program." *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 154 (1st Cir.1998). In the public housing context, a "qualified" handicapped individual is one who could meet the authority's eligibility requirements for occupancy and who could meet the conditions of a tenancy, with a reasonable accommodation or modification in the authori-

ty's rules, policies, practices, or services.... *Cf. Whittier Terrace Assoc. v. Hampshire,* 26 Mass.App.Ct. 1020, 1020–1021, 532 N.E.2d 712 (1989). *Here, the tenant [ ] made no showing that, even if eviction proceedings were withdrawn or delayed, [she ] could comply with the terms of [her ] lease by not [harming her ] neighbors. The evidence plainly suggested otherwise.*

820 N.E.2d at 823–24 (emphasis added; citations to state law omitted). In my opinion, the foregoing analysis, and especially the last two italicized sentences, can be readily applied to the present case.[16] The conditions in and near Ms. Douglas' unit have already created an "undue burden" on her landlord and fellow-tenants, and she has proffered no realistic prospect that the danger to health and safety would disappear if her eviction were briefly delayed.

Aside from the reasoning of *Andover Hous. Auth.,* I think it important to emphasize another issue with which the majority, in my view, does not come to grips. The practical consequence of finding Ms. Douglas to be mentally handicapped for purposes of the Act is to excuse her, at least for some time (and in this case, she has already been excused for a very long time) from the basic obligation of any tenant, under the lease and under the law, to maintain her apartment in a decent and sanitary condition and to avoid any threat to the health and safety of others.[17] Be-

---

**16.** *Andover Hous. Auth.* is distinguishable from the present situation because, in this case, there has been no trial. One might fairly infer from this record, however, that, as a matter of law, Ms. Douglas was not a "qualified" handicapped person; the burden that she had placed on the landlord and on her fellow-tenants for a year demonstrated that her condition could *not* be readily accommodated without help from the District that, for the entire period, had not been forthcoming,

and which was most unlikely to become suddenly available.

**17.** According to the majority, the extended duration of the unsanitary and unhealthy conditions was the fault of the landlord for not replying to the essentially *content-less* February 20 letter from counsel for the tenant. *See Douglas I,* 849 A.2d at 998–99 (dissenting opinion) (quoting that letter in its entirety). The majority also attributes the delay in reme-

cause of this, "reasonable accommodation" comes to mean at least temporary preferential treatment and, necessarily, the tolerance, in Ms. Douglas' case, of unsanitary conditions that would warrant the immediate eviction of another tenant.[18]

Mental impairment is a handicap under the Act, but not all handicaps have the same consequences. If a deaf tenant is permitted to have a hearing dog notwithstanding a "no pets" clause in the lease, see Bronk v. Ineichen, 54 F.3d at 428–29, this does not seriously affect the living conditions of his or her fellow-tenants. Similarly, if a tenant who suffers from multiple sclerosis is provided with a parking place close to the entrance to the building, Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 336 (2d Cir.1995), any inconvenience to tenants who are able to walk is trivial. Mentally handicapped tenants may also be entitled to accommodations comparable to those in Bronk and Shapiro. One court has held, for example, that a mental-

ly ill patient might be permitted to retain his cat, in contravention of the landlord's "no pet" policy, where, according to a psychiatrist's affidavit, the tenant needed the pet in order to deal with his depression and anxiety. Crossroads Apts. Assocs. v. Le Boo, 152 Misc.2d 830, 578 N.Y.S.2d 1004, 1005–07 (City Ct. Rochester, N.Y. 1991).[19] In that case, too, however, any possible consequences for other tenants were minimal.

Ms. Douglas' request for what she calls a reasonable accommodation, on the other hand, is dramatically different. Her counsel's proposal would require the landlord and the other tenants to countenance the continuation of unsanitary, unhealthy, and unlawful conditions that, in this case, have existed for a very long time. In my opinion, the legislators who voted for the Act as amended would be startled to learn that the statute that they had enacted—the Fair Housing Amendments Act—was being relied upon to prolong, even briefly,

---

dying the Housing Code violations to the "normal requirements of judicial process that landlords risk having to accept from the business they have chosen to pursue." In other words, say my colleagues in the majority, "tough, you are a landlord, you chose your own way of making a living, and you should expect to have to tolerate the filth, rodents and stench for a long period of time without whining about it!" But the majority's "blame the landlord" approach notwithstanding, the tenant's attorney could not have settled the case even if Kriegsfeld's counsel had responded to the February 20 letter; no settlement proposed by opposing counsel can be achieved unless the client agrees to it, and Ms. Douglas was nowhere to be found! Moreover, the "normal requirements of the judicial process" often take a very long time, and if a tenant claiming to be suffering from alcoholism and a mood disorder is not deemed responsible for the effect on others of her violations of the lease and the housing code, then there is in effect no prompt protection for such a tenant's landlord and fellow-residents, even if, as in this case, the conditions imperil their health and well-being.

18. If a sober and mentally unimpaired tenant were to violate the Housing Regulations one quarter as badly as Ms. Douglas did, he or she could properly be evicted for noncompliance with the terms and conditions of the lease. If the landlord were to evict that tenant but let Ms. Douglas stay on, however, then I suspect that the explanation for the different treatment would fall on deaf ears—not only of the evicted tenant, but also of the tenants as a group and of most ordinary citizens. Indeed, as noted in the leading discussion of the kind of issue presented in this case, "a property manager may lose other residents as a result of the conduct of one [allegedly] disabled resident." Reasonable Accommodation & Direct Threat, 36 IND. L. REV. at 761. The protracted toleration of Ms. Douglas' tenancy assuredly did not come as a boon to her neighbors.

19. In the Crossroad Apts. case, the landlord's motion for summary judgment was denied.

the "right" of any tenant, whether black or white,[20] female or male, alcoholic or sober, mentally ill or mentally healthy, to remain on the premises notwithstanding the kinds of prolonged and extensive violations of the lease and of the Housing Regulations disclosed by this record.

All of this goes to whether the requested accommodation was reasonable, and points unerringly to a negative answer to that question. Taking into consideration Ms. Douglas' overall behavior and refusal to cooperate, there is simply no evidence in the record, nor any realistic proffer, that intervention by the District government could promptly remedy the conditions in and near Ms. Douglas' unit. Even if giving a tenant with Ms. Douglas' alleged affliction additional time to come into compliance with the lease and the housing regulations could be viewed as a "reason-

able accommodation" in the abstract, it cannot fairly be so viewed in this case, given the extent and duration of the violations, the length of time that Ms. Douglas had already been given, and her counsel's failure to provide any specifics in his proposed accommodation, even on the trial date.[21]

## VIII.

## THE CIRCUMSTANCES AT THE TIME OF TRIAL

I turn now to the situation confronting the judge on the eve of trial, when he was called upon to rule on the question whether Ms. Douglas' attorney should be permitted, on the record as it then stood, to present a Fair Housing Act defense. The critical facts at that time were as follows:

---

20. Or of any other "color."

21. My conclusion is, I think, buttressed by Ms. Douglas' emphatic and absolute refusal of any psychiatric help. Jennifer L. Dolak has written persuasively on this particular subject:

> When a mentally ill person's abusive conduct arises from failure to take prescribed medication, the appropriate accommodation may be that continued residence be conditioned upon taking the medication.

*Reasonable Accommodation & Direct Threat*, 36 IND. L. REV. at 782. In this case, as Ms. Douglas' attorney acknowledged in his brief to the division, Ms. Douglas' refusal of treatment was evidently quite categorical; she did not even stay around, and, being absent, could not agree to this condition.

It is said that God helps those who help themselves. Here the court apparently believes that the law helps those who *don't* help themselves, or at least one of their number, even when there has been no testimony that her alleged mental illness—consisting of alcohol addiction and mood disorder NOS—renders her completely helpless. I apprehend that the majority's approach in this case will serve as an unfortunate precedent in cases involving people with disabilities, for the

court seems to require no effort at all from this allegedly handicapped tenant; she is treated as if she is so helpless that she cannot be expected to take responsibility for any of her actions or try to do anything at all on her own behalf, and her failure to take responsibility is totally excluded from the court's "reasonable accommodation" calculus.

I cannot and do not claim any psychiatric expertise, but common sense surely tells us that if we do not expect, require, or encourage any effort from a person suffering from a handicap, then no effort is likely to be forthcoming. For example, an addict is unlikely to seek treatment and to try to stop drinking or using if her addiction provides her with privileges which are denied to a sober person. *Cf. Dupree v. United States*, 583 A.2d 1000, 1005 (D.C.1990) (concurring opinion) (a rule denying the "addict exception" to mandatory minimum sentencing to a defendant who tests "clean" while on pretrial release would "provide an insidious but compelling motive to any addict to give in to the perverse compulsion to use the drug and not to try to fight it"); *id* at 1004 (majority does not disagree with concurring opinion). Surely the Fair Housing Act was not meant to provide allegedly handicapped persons with an incentive *not* to help themselves.

1. From the date of the notice to quit or cure to the trial date, neither the tenant nor the District had done anything at all to remedy the violations of the lease and the law that prompted the landlord to send the notice.

2. The conditions in and around Ms. Douglas' unit were extreme, and they had been so for over a year, with the stench and the assorted housing code violations inevitably threatening the health and safety not only of Ms. Douglas but of the landlord and of the other tenants as well. As a matter of common sense, very frequent and very thorough cleaning and disinfecting by APS would be required immediately in order to remedy the situation.

3. On June 17, 2002, the eve of trial, Ms. Douglas' attorney was unable to tell the court how long a delay he was requesting on his client's behalf:

> THE COURT: How much time did she ask for?
>
> COUNSEL FOR: As I stated, she's mentally ill. MS. DOUGLAS

4. Ms. Douglas' attorney acknowledged that he could not speak for the District.

5. Although the District's representatives, including Mr. Byrd of APS, had appeared before the court, no proffer or representation had been made by the District or by any of its agents or employees (and the court had no way of guessing) whether, when, how often, or how thoroughly APS was prepared to clean the unit and restore safe and healthy conditions.

6. Ms. Douglas had not participated in the lawsuit or cooperated with her attorney, and she was nowhere to be found.

7. In asking for a "reasonable accommodation," Ms. Douglas' attorney had no information regarding whether such an accommodation would be acceptable to her, and he could make no representation in this regard.

8. Finally, there was no evidence that representatives of the District would be admitted to Ms. Douglas' unit to clean and to make repairs.

Perhaps it is (theoretically) minimally possible that, notwithstanding all of these obstacles, Ms. Douglas could nevertheless have presented a case, sufficient for consideration by the jury, that she or the District could promptly cure her extreme and protracted violations of the lease and the law and eliminate the threat to health and safety. At some rarefied level of abstraction, her counsel might conceivably have been able to show that, if one considered only the future and not the past, the accommodation that her attorney had requested—apparently, that she be allowed to stay in her unit for some period while APS cleaned it and kept it clean—was a reasonable one. In theory, APS might suddenly, frequently, efficiently, and with lightning speed, do that which it had failed to do at all for a year. It is said that anything is possible, and I suppose that, hypothetically, Ms. Douglas might now abandon her policy of non-cooperation and welcome the cleaning crew with open arms. Perhaps the corridor outside her apartment would soon smell like a rose. But I perceive no realistic chance—indeed, no chance at all—that all of these improbable and implausible possibilities would come to pass. I quote the Supreme Judicial Court of Massachusetts:

> Nearly seven months [22] passed from the time that the tenants were served with the notice to quit and the trial was held in the summary process action. That was more than ample time for the ten-

---

**22.** In this case, ten months had passed since the notice to cure or quit was served, and much longer than that from the beginning of the violations.

ants to put in place an effective treatment plan for addressing Barskaya's health problems while eliminating, or significantly reducing the excessive noise emanating from her apartment.[23] The fact that Taylor was still complaining about the noise on a daily basis in May 2003, suggests that the tenants were unable to abate the problem.[24]

*Andover Hous. Auth.,* 820 N.E.2d at 825.

The court suggests that a remand is appropriate because it would not take long to determine whether, with the aid of APS, Ms. Douglas could or would clean her unit, eliminate the odor, and maintain safe and sanitary conditions from that moment on. In my opinion, however, the majority's notion that all would be resolved in a couple of weeks is illusory. I reiterate what I wrote when the case was before the division:

> Even if—and on this record it is a gargantuan and almost droll "if"—representatives of the District were suddenly to "[straighten] up and fly right"[25] and to clean the apartment within a week or two of an order of the trial court, there would be no assurance (or reason to believe) that the unit would remain clean. If it did not, there would of course be more allegations and denials, more litigation, more delay, and more arguable violations of the lease and of the law, and it is naive indeed to suppose that the case would quickly be over. Moreover, given the state of the apartment over a long period of time, as well as the tenant's lack of interest in and absence from the pretrial proceedings and from the trial, no impartial jury could reasonably find the proposal made by counsel for the tenant to be a "reasonable accommodation" (and, in my opinion, no reasonable jury would have so found).

*Douglas I,* 849 A.2d at 973 (dissenting opinion). Accordingly, I would affirm the judgment.[26]

---

**23.** The problem in Ms. Douglas' case was not noise, but dangerous and unsanitary noncompliance with the Housing Regulations.

**24.** Here, the resident manager testified at trial that the filth and stench had continued unabated.

**25.** This phrase, unfortunately misquoted in my dissent in *Douglas I* as "shape up and fly right," comes from the song *Straighten Up and Fly Right,* words and music by Nat King Cole and Irving Mills.

**26.** I think it appropriate to comment briefly on the majority's "Response to Dissent":

1. According to the majority, accommodating Ms. Douglas' alleged disability would have been a trivial matter. "Plainly, no undue burden on the landlord is called for here." Plainness, like beauty, lies in the eye of the beholder. As of the trial date, the landlord and its other tenants had *already* been burdened by the most severe housing code violations (and threats to health and safety) for about a year. The only explanation for the majority's position—consistent with the entire tone of the opinion—is that the past is irrelevant and that the interests of Ms. Douglas' fellow-tenants are too peripheral to merit consideration.

2. Once again, the majority blames any delay in the case on what it calls the landlord's "refusal" to respond to the February 20 letter from counsel for the tenant. In my opinion, this ground, which made its first appearance in this case in the division majority's opinion, is completely spurious. I have dealt with it in some detail in this opinion and, more comprehensively, in my dissent in *Douglas I.* But even if one were to assume that the landlord had some obligation to respond to this letter, and to "open a dialogue," the failure to do so could make no difference, for Ms. Douglas' attorney could not agree to any settlement without his client's consent, and no such consent was forthcoming. The majority's cherished "dialogue" would therefore have been a monologue or a Kriegsfeldian soliloquy. The majority's theory that everything was the fault of the landlord founders on this simple undisputed and indisputable fact.

GLICKMAN, Associate Judge, with whom WASHINGTON, Chief Judge, and WAGNER, Associate Judge, join, and with whom SCHWELB, Associate Judge, joins with respect to all but the first paragraph, dissenting:

I agree with certain important conclusions that the majority reaches. In particular, I agree that Ms. Douglas proffered enough evidence to permit a trier of fact to find by a preponderance of the evidence that mental illness and alcoholism rendered her unable to keep her apartment clean and sanitary as required by her lease.[1] In principle, I also agree with the majority's conclusion that the Fair Housing Act permits a handicapped tenant to request a reasonable accommodation to enable her to maintain her tenancy at any time before a judgment of possession has been entered. As a corollary, I agree as well that a landlord who ignores even a last-minute request by a tenant to accommodate a disability does so at its peril, though I think it overstates matters to suggest that a landlord's failure to "open a dialogue" with the tenant and engage in an "interactive process" is in itself a violation of the Fair Housing Act. The violation lies in the landlord's unjustified refusal to grant a handicapped tenant's request for a reasonable accommodation that is necessary to afford the tenant equal opportunity to use or enjoy the leased dwelling. 42 U.S.C. § 3604(f)(3)(B). Finally, I also agree with the majority that, in determining whether a landlord is justified in rejecting a requested accommodation because the tenant poses an unacceptable threat to the health or safety of others, a court must consider the extent to which the proposed accommodation would alleviate the threat.

Nonetheless, I think the majority goes astray in concluding that a jury could find that Ms. Douglas requested a reasonable accommodation in this case. Her only request was for a last-minute, indefinite stay of the eviction proceedings to allow her counsel to continue to try to enlist the District of Columbia government to develop, fund and carry out a suitable plan of some kind to keep her apartment clean. The only concrete proffer her counsel could make in support of this request was that a government fund did exist for pay-

---

3. The majority has contrived to focus on certain facts in *Andover Hous. Auth.*, 820 N.E.2d at 820, while ignoring the legal principles for which that decision stands. It is true that the landlord in that case engaged in negotiations with the tenant (just as Kriegsfeld offered to do here, only to be thwarted by the unavailability of Ms. Douglas). The court held, however, that there was *no statutory obligation* for the landlord to conduct a dialogue with the tenant, however desirable such a dialogue may be. *Id.* at 822. The case also necessarily stands for the propositions for which I have quoted in my footnote 3 and elsewhere.

1. While the trial court certainly did not abuse its discretion in finding that Ms. Douglas's witnesses lacked the necessary expertise to diagnose her mental condition, a precise diagnosis was not required in this case. What was required was merely competent evidence that Ms. Douglas suffered some kind of mental handicap that interfered with her ability to maintain her apartment in a safe and sanitary condition. Ms. Douglas's witnesses were able to provide such evidence based on their personal observations of her symptoms, behavior and circumstances, even if they lacked special competence in mental disorders. *See, e.g., de Bruin v. de Bruin*, 90 U.S.App. D.C. 236, 237, 195 F.2d 763, 764 (1952) ("[L]aymen who have had a particularly good vantage point for observing the person under scrutiny may express their opinions as to mental capacity to court or jurors who have not had such an opportunity."). Even if it is debatable whether, or to what extent, the witnesses properly could opine on the causal connection between Ms. Douglas's mental status and the status of her apartment, the trier of fact could draw the necessary inference.

ing contractors to clean apartments for handicapped persons in need of such services, and that Ms. Douglas, though she had disappeared, was eligible for such assistance. Although counsel had been in contact with the government officials for months, the District still had not agreed to clean the apartment and no cleaning plan had been proposed or even developed.[2] Judge Schwelb's dissent amply demonstrates the unreasonableness of Ms. Douglas's stay request in light of the inadequacy of her counsel's proffer, the serious health hazards created by Ms. Douglas's tenancy, her disappearance and her resistance to remedial measures, and the District government's demonstrated lack of interest and prolonged failure to address the situation. I write separately because I think it important to highlight another, more basic respect in which Ms. Douglas's request was deficient. As the trial court recognized, Ms. Douglas's proposal was simply too vague to rise to the level of a *bona fide* request for a reasonable accommodation under the Fair Housing Act.

Judge Ferren's opinion for the court insists "there was no disqualifying vagueness here." *Ante* at 1121. Given the number of judges who have joined either this dissent or Judge Farrell's concurrence, that is not a statement to which a majority of this court subscribes. As Judge Ferren is compelled to concede, Ms. Douglas "never proffered the kinds of details that ordinarily would be required to convince a fact-finder that [her] proposal was reasonable, that is, likely to keep the apartment clean." *Ante* at 1136. "For example," the majority opinion acknowledges, "tenant's counsel did not specify the number of days required for the stay, or the basis for assuring tenant cooperation, or the frequency and duration of cleaning by the District government." *Id.* The February 20 letter from Ms. Douglas's counsel, on which the majority opinion places so much reliance, did not even state "what kind of accommodation the tenant was seeking or how ... the District government would help," and it did not even mention a stay of the eviction proceedings. *Id.* at 1124.

Despite its evident appreciation that Ms. Douglas in fact never made a specific enough request for accommodation, Judge Ferren's opinion offers two reasons for refusing to affirm the trial court. The first reason is that the February 20 letter "supplied enough detail"[3] to obligate the landlord to "open a dialogue with the tenant" and "press[ ] for particulars." *Ante* at 1137. "By declining to do so," the majority asserts, "the landlord failed to demonstrate any missing element or other inherent defect in the tenant's proposal [and] thereby kept the level of specificity

---

2. This would be a different case if, for example, funding had been approved, an acceptable cleaning plan had been developed, and District officials simply needed a little more time and the landlord's acquiescence to begin implementing it. The majority opinion contains assertions such as the following: "Here, the tenant has proffered that the D.C. government will clean the apartment and keep it clean. Prima facie that will solve the problem...." *Ante* at 1137. Such assertions reflect a misreading of the record. At most, Ms. Douglas's counsel was proffering only what he hoped and expected the District government would be willing and able to do. The majority opinion relies on counsel's opaque statement that his witnesses—a mental health specialist with the Department of Mental Health and a social worker with Adult Protective Services—could "satisfy" the landlord that the District government would "get the place cleaned up." *Id.* at 1117. Since no plan had been developed and funding had not been approved, that statement counts for little.

3. Of course, as the majority opinion concedes, the February 20 letter supplied no detail at all as to the accommodation that Ms. Douglas sought.

required to establish prima facie 'reasonableness' at the minimum." *Id.* at 1137. The second reason advanced by the majority is that it is, supposedly, "clear from the record that any more detail proffered by the tenant to the trial court would have been fruitless," because the court's rulings against Ms. Douglas on other grounds "would likely have forestalled further inquiry into whether any kind of stay, coupled with a cleaning effort, would have been reasonable." *Ante* at 1138.

These reasons do not stand up to scrutiny. The first reason, the landlord's supposed non-responsiveness to Ms. Douglas's request, is flawed both factually and legally. To begin with, as a factual matter, it is unfair for the majority to castigate the landlord for not opening a dialogue with Ms. Douglas and her counsel to fill in the details of her February 20 request for an unspecified accommodation. Although the landlord did not respond to that vague request immediately, the record does not support the assertions in the majority opinion that the landlord's counsel "essentially stonewalled" and "refused any dialogue with the tenant's counsel" until it was too late for "a good faith exchange." *Ante* at 1142, 1143. Two weeks prior to trial, when a productive dialogue was still possible, the landlord's counsel solicited "the details" of a suitable accommodation from Ms. Douglas's counsel, and her counsel could not provide them. The landlord cannot be faulted for having concluded then, just as a majority of this court has

concluded now, that the tenant's proposal "simply lacked any specifics" and could not be evaluated. *Id.* at 1117. Thereafter, as trial drew nearer and *Ms. Douglas's counsel furnished no additional information in response to the landlord's inquiry,* it was understandable that the landlord did not "see there's any way to get around or to accommodate Ms. Douglas in this matter to allow her to stay." [4] *Id.* at 1117. No reasonable jury, I respectfully suggest, could find on these facts that the landlord was "not open to any accommodation even if reasonable." *Id.* at 1117 n. 4. In point of fact, moreover, Ms. Douglas herself disappeared *"several weeks"* before the April 17 pretrial conference, *i.e.,* soon after the February 20 letter, and her counsel was unable to find or contact her. *See id.* at 1116 n. 3, 1117 n. 4. As a result of Ms. Douglas's conduct, a meaningful dialogue of the sort envisioned by the majority ceased to be possible.[5]

More fundamentally, any failure of the landlord to pursue a dialogue with Ms. Douglas and her counsel was legally immaterial because the landlord was not responsible for Ms. Douglas's failure to "fill in the details" and the landlord had no duty to fill in the details itself. The "details" that were necessary depended not on information to be supplied by the landlord, but on information that needed to come from Ms. Douglas herself, the District government, and its cleaning contractor. A landlord's failure to open and maintain a dialogue with a tenant may be material, and can

---

4. Thus, I think the majority opinion is not describing this case when it says, for example, that "the details about tenant cooperation, the strength of the government's commitment, and the frequency of cleaning would likely be spelled out with some precision when the landlord participates and insists on particulars before deciding whether, from its viewpoint, the accommodation would be reasonable." *Id.* at 1137.

5. The majority opinion asserts that Ms. Douglas's "unavailability for settlement discussions" is not "legally determinative of anything." *Id.* at 1137 n. 4. Her unavailability for reasonable accommodation discussions, however, was "determinative" of everything, for it made it impossible for her counsel even to propose a reasonable accommodation for the landlord's consideration.

result in liability under the Fair Housing Act for discrimination, if it thwarts the development, presentation or evaluation of the tenant's request for a reasonable accommodation and operates as a disingenuous excuse for not granting that request.[6] *Cf. Jankowski Lee & Assocs. v. Cisneros,* 91 F.3d 891, 895 (7th Cir.1996) ("Petitioners' denial of Rusinov's request based on their lack of knowledge of the extent of his injury is simply a ruse to avoid the penalty for violating the FHA.... If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue."). But Ms. Douglas makes no plausible claim that her landlord's inaction frustrated her efforts to provide the requisite specifics for her accommodation request. Ms. Douglas simply needed to work with the District to produce a reasonable cleaning plan that the government would commit to fund and carry out, or at the very least a firm timetable for the District to develop and commit to such a plan; except insofar as her disappearance probably made it impossible,[7] it remains an unexplained mystery why her counsel and the District failed to do the necessary work by the time of trial. In this mystery, the landlord had no part.[8]

As to the second reason offered by the majority, that it would have been "fruitless" for Ms. Douglas to proffer "more detail" about her accommodation request because the trial court (supposedly) "forestalled further inquiry" by ruling against her on other grounds, it too is flawed. If anything is clear from the transcript, it is that even as of the day of trial, Ms. Douglas's counsel had no "further detail" to proffer. If the trial court had allowed Ms. Douglas to put on her discrimination defense, it would have fallen flat on its face, because she had no evidence to present. Briefly put, her counsel did not know and could not proffer how long a stay of eviction would be necessary to develop and implement a cleaning program, what kind of cleaning program the District government might be prepared to fund and institute if given enough time, or even whether the missing Ms. Douglas would permit the District's agents, whom she distrusted, to enter her apartment to carry it out.[9]

---

**6.** Judge Ferren's opinion reasons that "a landlord's failure to engage in the required dialogue relieves a tenant from any need to proffer additional specifics *beyond those required for a coherent, ostensibly feasible proposal* that would allow a reasonable jury to find that if all its elements were implemented, it would accommodate the tenant's handicap and cure her default, presently and for the future." *Ante* at 1142 (emphasis added). Notwithstanding the tenor of Judge Ferren's opinion, however, a majority of this court is of the view that Ms. Douglas has not yet presented such a "coherent, ostensibly feasible" proposal. Simply asking for more time to explore with the District government the possibility of coming up with a cleaning plan is not the same thing.

**7.** On June 5, 2002, twelve days before trial, Ms. Douglas evidently surfaced briefly for a meeting with James Sutton of the Department

of Mental Health and Damon Byrd of Adult Protective Services. The majority's apparent view that this last-minute, momentary reappearance by the tenant was timely, *ante* at 1140, stands in marked contrast to its view that the landlord's initiation of a dialogue two weeks before trial came too late.

**8.** It may be, as Ms. Douglas's counsel stated, that District government officials would not agree to clean Ms. Douglas's apartment if she was going to be evicted anyway. *Ante* at 1117. Such a position in no way prevented District officials from specifying what the government would be willing to do to enable Ms. Douglas to remain in her apartment.

**9.** "[W]ho is to say," the majority rhetorically inquires, "that the tenant's counsel would not have been able to find his client with the good news that her defense would go forward (assuming that her presence was essential to that

In sum, I think we should affirm the trial court's preclusion of Ms. Douglas's discrimination defense on the ground that she never specifically requested a reason- able accommodation and therefore had no such defense to present.

defense)"? *Ante* at 1143. I suppose anything is possible, but the fact remains that Ms. Douglas's counsel had tried to find her "many times" without success. *Id.* at 1116 n. 3. In considering whether the trial court properly precluded the tenant's defense, speculative possibilities are not a substitute for lack of evidence.